HINCHMAN *et al. v.* CITY WATER CO.

(*Knoxville,* September Term, 1942.)

Opinion filed January 9, 1943.

Rehearing denied February 1, 1943.

Joseph Carson, Sheldon F. Potter, T. Pope Shepherd, and Jere Tipton, all of Chattanooga, for appellant.

Spurlock & Spears, of Chattanooga, for appellee.

Mr. Chief Justice Green delivered the opinion of the Court.

This suit was brought by the complainants to recover a balance alleged to be due under a contract hereafter set out from defendants City Water Company of Chattanooga and Mountain Spring Water Company and also for a declaration as to the rights of the parties under said contract. The chancellor rendered a decree against Mountain Spring Water Company for the amount alleged to be due but absolved the City Water Company from liability for such sum. He further construed the contract to impose a continuing obligation on Mountain Spring Water Company but by his declaration relieved the City Water Company of any obligation thereunder.

Mountain Spring Water Company did not appeal but City Water Company took the case to the Court of Appeals. That court modified the decree below and held the latter company liable for the amount due under the contract and declared that company liable for the further obligations of the contract. This court granted City Water Company's petition for *certiorari*.

In 1886 and prior thereto Charles C. Anderson and Robert Cravens owned a tract of about eight and one-half acres on Lookout Mountain near the City of Chattanooga. Under this tract there was a large spring or stream of clear water. The location was considerably above the level of the City of Chattanooga and the owners conceived the idea of supplying water to that city. A corporation was brought out known as Mountain Spring Water Company and a franchise from the city secured for that company to lay pipes through the streets and sell water to the inhabitants.

In October, 1886, Anderson and Cravens entered into a contract with one W. W. Taylor granting him the use of their tract of land with the right to use the water referred to for a period of fifty years. This lease was on the same day assigned by Taylor to one Hinchman and Hinchman assigned his rights under the contract to Mountain Spring Water Company.

Material portions of the contract between Anderson and Cravens on the one hand and Taylor on the other hand and assigned and re-assigned as just above stated are substantially these:

The use of all the water flowing "through the cavern on Lookout Mountain, known as Cravens Cave . . . together with about eight and one-third acres of land around the shaft sunk into said cave, and also the right of way for pipes from the cave to or near the South

Tredegar Iron Works'' was granted to Taylor. Continuing ''for and in consideration of which the said W. W. Taylor, his heirs, executors and assigns, agree to pay for the use of said water the sum of Ten Dollars per day, payable at the end of each three months, after the pipes shall have been laid from the cavern to Fourth Street in the City of Chattanooga.'' Some other elements of consideration are set out, not material in this investigation, and it was provided that the $10 per day payments should be continued for two years, ''and thereafter at the rate of Fifteen Dollars per day for the term of forty-eight years, at the end of which period the said Anderson shall have the right to purchase the said water works, pipes and franchise at their then appraised value.'' The contract contained an undertaking on the part of Anderson to further the interests of Mountain Spring Water Company in various ways and concluded, ''And it is further understood that said Anderson shall place the charter in possession of said Taylor, or his assigns, and the franchise of the same including rights of way, for laying pipes to and from the town, without charge beyond said rental.''

It seems that after this contract was executed and assigned to Mountain Spring Water Company a question came up between Anderson and Taylor as to what would become of the franchise of Mountain Spring Company at the expiration of the contract. Anderson was under the impression that the franchise would revert to Cravens and Anderson. Taylor had a contrary view. It appears that Taylor proposed to compromise the matter by allowing Anderson and Cravens ''to renew the lease'' at a not less rate than was provided therein. This proposition was accepted and a supplementary contract was entered into by Anderson and Cravens on the one

hand and Mountain Spring Water Company on the other, providing as follows: "In connection with the lease herewith attached, it is further agreed that the party of the first part (Anderson and Cravens), their heirs and assigns, have the right of renewing said lease, for terms of Fifty Years, at an appraisement rental of not less than Fifteen Dollars per day, in any event. The party of the first part having the right to renew said lease upon said terms, at the expiration of each Fifty Years. The terms of this lease are to be binding and effectual against the party of the second part (Mountain Spring Water Company), their heirs and assigns, including every purchaser & transferee from him either at public or private sale."

Without going into details, it is sufficient to say that water mains were laid connecting the spring with pipes in the city and this water was used in the City of Chattanooga and in its suburbs until 1912. At the time of the events we have detailed another water company was operating in Chattanooga known as Lookout Mountain Water Company, using water from the Tennessee River. The name of this company was subsequently changed to City Water Company. An Eastern holding company acquired the stock of City Water Company and Mountain Spring Water Company both. For several years the corporate organization of Mountain Spring Water Company was kept up but many years ago this effort was abandoned and the $15 per diem stipulated in the original contract has been paid to those entitled thereto by the City Water Company. These payments continued until the expiration of the fifty-year term, although the water from the Cravens spring or cavern had not been used since 1912.

Just prior to the expiration of the fifty-year period the owners of the spring or cavern and the surrounding land were notified by City Water Company that it would not renew the contract and no further payments would be made thereunder. There was a controversy as to whether the fifty-year term expired in October, 1936, or in December, 1936. The complainants insisted that the latter was the correct date and filed this bill to recover the payments for these two months which had not been paid and also "for a declaratory decree declaring and adjudging that said renewal of said lease agreement is valid, and that defendant City Water Company of Chattanooga and Mountain Spring Water Company are obligated to pay complainants . . . rental at $15.00 per day for the renewal term of fifty years accordingly."

A number of defenses were interposed in the answer filed by the defendants and some proof was taken.

Many of the defenses interposed were rejected both by the chancellor and by the Court of Appeals as being without merit. The opinions of the two courts sufficiently discuss the defenses deemed unavailing and we need not go into them.

The chancellor relieved City Water Company of obligations under the contract because he thought there was no merger of Mountain Spring Water Company into the other company and that there was no such assignment of this contract by the one corporation to the other as could be recognized.

The Court of Appeals considered that there had been a *de facto* merger or absorption of Mountain Spring Water Company and its assets into City Water Company which rendered the latter company liable for the obligations of the former under the doctrine of *Jennings, Neff & Co.* v. *Crystal Ice Co.*, 128 Tenn., 231, 159 S. W.,

1088, 47 L. R. A. (N. S.), 1058, and that line of authorities. This conclusion of the Court of Appeals is very vigorously assailed. We are not, however, required to test its propriety.

Apart from the fact that Mountain Spring Water Company has not functioned for more than thirty years, City Water Company has been in possession of all the properties of Mountain Spring Water Company and at regular intervals paid the $15 per diem to Anderson and Cravens and their representatives up to the time that the fifty years expired according to its computation.

All the authorities are to the effect that when a person other than a lessee is shown to be in possession of leased premises, paying the rent to the owner, a presumption arises that the lease has been duly assigned to such person. This was so held in *Sander* v. *Piggly Wiggly Stores, Inc.*, 20 Tenn. App., 107, 114, 95 S. W. (2d), 1266, *certiorari* denied by this court. See also McAdam on Landlord and Tenant (5th Ed.), pp. 664, 993, 999; Thompson on Real Property, (Permanent Ed.), sec. 1401; 35 C. J., 991; 32 Am. Jur., 326.

It is true this presumption is rebuttable but such evidence as there is in this record tends to confirm the presumption rather than to rebut it.

The pipe line leading from the cave or spring passed under certain land formerly owned by Cravens and subsequently conveyed by Cravens and wife to Nashville, Chattanooga & St. Louis Railway. In August, 1913, in consideration of $2,500, City Water Company entered into a contract with the railway whereby City Water Company released and quitclaimed to the railway all its right, title and interest in said land and further released and abandoned the pipes laid under said land and its right to dig up and renew the same. In the preamble to

this instrument the original contract between Anerson and Cravens and Taylor was recited, which passed to Taylor the right to lay and maintain water pipes from the spring on the side of Lookout Mountain to the South Tredegar Iron Works in Chattanooga, "which right of way," the contract between the railway and City Water Company recited "was subsequently assigned to City Water Company by W. W. Taylor and Mountain Spring Water Company."

It also appears that in a statement made to the Public Utilities Commission for the purpose of fixing its rates, City Water Company included among its obligations liability to pay this $15 per diem to Anderson and Cravens and their representatives.

Other things appear in the record tending to confirm the presumption of an assignment and we find nothing to negative such presumption.

■ The original lease contract and the supplemental contract were both duly recorded in the register's office of Hamilton County and otherwise there can be no question of notice to City Water Company of the contents of these papers. A renewal covenant runs with the land. Taylor on Landlord and Tenant, section 262; Thompson on Real Property (Permanent Ed.), sec. 1272; 35 C. J., p. 1013. The contract before us relates to a thing *in esse* and furthermore it is specifically binding on the assignees of the lessee. *Carnegie Realty Co.* v. *Carolina C. & O. Railroad Co.*, 136 Tenn., 300, 189 S. W., 371; *Bream* v. *Dickerson*, 21 Tenn. (2 Humph.), 126; *Spencer's Case*, 5 Coke, 16.

■ We think, therefore, that the Court of Appeals properly held City Water Company liable for the balance of royalties due up to the expiration of the fifty-year term. The chancellor and the Court of Appeals con-

curred in finding that the term expired December 31, 1886, instead of October 7, 1886. In so far, therefore, as the Court of Appeals rendered a decree for the balance due on the old contract, that decree is affirmed.

We are not willing, however, on the record before us, to make the desired declaration that the renewal portion of the contract involved is enforceable and that City Water Company as assignee is obligated to renew and pay the owners of the property $15 a day for a renewal term of fifty years.

We are not required to consider all the objections raised by City Water Company to such a declaration. We decline the declaration on the facts as developed in this record.

The original contract was entered into beyond question on the supposition that the water from the spring was wholesome, pure, and suitable for distribution to the inhabitants of Chattanooga. Indeed it was water of that character. The evidence shows that this water was for many years regarded as one of the purest, most sanitary waters available to any city in the country. It was tested at intervals but the test was regarded as almost a formality.

The deposition of Wellington Donaldson, a sanitary engineer, now employed by the City of New York, was taken by the defendants herein. Mr. Donaldson was formerly connected with the holding company owning the stock of City Water Company and other water companies. He was located at Birmingham, Alabama, and made frequent tests of the various waters used by the companies under his employer's control. He was familiar with this Cravens spring water and tested it at intervals in the course of his duties. He was asked what was brought to his attention in 1910 or 1911 as to the

quality of water being supplied from this spring. He said: "That spring up until that time had a reputation of being one of the best waters the company supplied, remarkable for its purity and routine analyses were regarded as more or less perfunctory because they almost uniformly showed a high degree of purity in that water. Then in 1909 or 1910—it was in 1910, I saw the reports on a set of samples of the spring water shipped to Birmingham and analyzed by the chemist down there. They were disturbing in showing that there was pollution in that spring. It seemed incredible. It seemed to be a laboratory error or an error in sampling. We immediately began sampling more frequently and it was discovered that that spring frequently was subject to very gross pollution. After getting a thorough check on that by our own laboratories, we had samples analyzed by independent laboratories which specialized in that business and those analyses confirmed our own findings as to the pollution of that spring."

Donaldson further testified that he made a visit to the spring and examined the whole face of the mountain in a sanitary survey to determine where the pollution entered and if it were possible to do something about it. He said that the water showed very clearly fresh or fairly recent contact with sewage, and that on his recommendation the use of the water was abandoned and the pipes in that portion of the city where this water had been used were connected with other mains which supplied Tennessee River filtered water. Pending the connection he advised all householders using this water to boil it as a precaution against water-borne disease.

The witness further testified that, while it was possible to purify this spring water, such an undertaking was

not feasible for reasons given. There is other evidence as to the pollution of the water.

We gather from the evidence that the Town of Lookout Mountain has since built up around the spring, that this town has no sewer system, and that accordingly fecal sewage seeps through the ground into the waters of this spring or stream.

The original contract involved pure, wholesome water suitable for drinking and other use by human beings. There is no such water in the spring now according to the evidence we have. The only evidence is that the adaptation of such water to human consumption is not feasible, that is, "not fit to be dealt with successfully." Webster's New International Dictionary.

Usable water, the subject of this contract, is no longer available from the spring. If we adjudge City Water Company bound to renew this contract, it will be required to take and pay for something altogether different from the subject matter of the contract as originally contemplated.

The leading case of *Taylor* v. *Caldwell,* 3 B. & S., 826, 122 Eng. Reprint 309, lays down this rule: ". . . where, from the nature of the contract, it appears that the parties must from the beginning have known that it could not be fulfilled unless when the time for the fulfillment of the contract arrived some particular specified thing continued to exist, so that, when entering into the contract, they must have contemplated such continuing existence as the foundation of what was to be done; there, in the absence of any express or implied warranty that the thing shall exist, the contract is not to be construed as a positive contract, but as subject to an implied condition that the parties shall be excused in case, before breach, performance becomes impossible

from the perishing of the thing without default of the contractor.''

This case has been generally followed in the United States and is approved in our own case of *Wiggins* v. *Gill,* 62 Tenn. (3 Baxt.), 140.

What are known as the Coronation cases, as illustrated by *Krell* v. *Henry,* 1903, 2 K. B., 740, are quite in point here. In those cases contracts were made for the use of certain rooms overlooking the street in London on which the coronation procession was expected to pass. On the day set for the coronation the King was sick and there was no coronation procession. Parties contracting for the rooms were held not liable.

In Williston on Contracts (Revised Ed.), Vol. 6, p. 5410, the following appears: ''As pointed out in the Restatement of Contracts, the essence of the modern defense of impossibility is that the promised performance was at the making of the contract, or thereafter became, impracticable owing to some extreme or unreasonable difficulty, expense, injury, or loss involved, rather than that it is scientifically or actually impossible. While the mere fact that performance of a promise is made more difficult and expensive than the parties anticipated when the contract was made will not ordinarily excuse the promisor as is shown by cases too numerous for citation. Nevertheless there are other decisions allowing an excuse where very greatly increased difficulty had been caused by facts not only unanticipated but inconsistent with the facts that the parties obviously assumed to exist or to be likely to continue. The true distinction is not between difficulty and impossibility. A man may contract to do what is impossible, as well as what is difficult, and be liable for failure to perform. The important question is whether an unanticipated cir-

cumstance has made performance of the promise vitally different from what should reasonably have been within the contemplation of both parties when they entered into the contract. If so, the risk should not fairly be thrown upon the promisor.''

The author collects many authorities supporting this test in a note and counsel for the City Water Company refer us to others of like tenor.

Certainly the corruption of this water from the mountain spring or stream is an unanticipated circumstance which has made performance of any obligation of the water company to renew this contract ''vitally different from what should reasonably have been within the contemplation of both parties when they entered into the contract.''

For the reasons stated we are unwilling, on the record before us, to make the declaration sought adjudging City Water Company bound to renew the contract for a period of fifty years. We go no further than this at present.

### On Petition to Rehear.

A petition to rehear is filed by the complainants in which counsel insist that we misapplied the law as to the defense of impossibility of performance of a contract. We think not. We have merely adopted the view now more generally accepted by modern authorities. Mr. Williston very interestingly traces the evolution of this defense in his work on Contracts (Revised Ed., Vol. 6, p. 5406 et seq.).

The old rule, approved as an abstract principle, but not there applied, is stated in *Trigg* v. *Hally,* 23 Tenn. (4 Humph.), 493, and is: ''Where a party by his own contract engages to do an act, it is deemed to be his own

fault and folly that he did not thereby expressly provide against contingencies and exempt himself from responsibility in certain events, and in such case, therefore, that is, in the instance of an absolute and general contract, the performance is not excused by an inevitable accident, or other contingency, although not foreseen by or within the control of the party.''

The new rule, as stated in the opinion herein, is: ''The essence of the modern defense of impossibility is that the promised performance was at the making of the contract, or thereafter became, impracticable owing to some extreme or unreasonable difficulty, expense, injury, or loss involved, rather than that it is scientifically or actually impossible.'' Williston on Contracts (Revised Ed.), Vol. 6, p. 5410.

This defense of impossibility of performance is considered at length in the Restatement of Contracts, section 454 et seq. Many illustrations of the application of the rule and comments are contained in this chapter of the Restatement.

The quotation from Mr. Williston just above is said by him to be the essence of the matter as laid down in the Restatement. Since he was the Reporter of the Restatement of Contracts and, as we understand, largely the author, we take this observation of his to be correct.

Counsel refer to earlier decisions of this court approving the old rule. We were not unmindful of these cases in disposing of the case before us. Doubtless they should have been noticed in the opinion but reference to them was omitted for the sake of brevity.

The last of the cases referred to was *Wiggins* v. *Gill*, 62 Tenn. (3 Baxt.), 140. This case was decided in 1873. We mentioned it in the opinion noting that it had approved the case of *Taylor* v. *Caldwell*, 3 B. & S., 326, 122

Eng. Reprint 309, which was one of the authorities upon which our opinion herein rested. *Taylor* v. *Caldwell* seems to have marked a sort of turning point in judicial thought.

Another decision of this court is *Trigg* v. *Hally, supra.* In so far as the case is here in point it involved what is called subjective impossibility as distinguished from objective impossibility—the difference between "the thing cannot be done" and "I cannot do it." In the latter class of cases impossibility of performance is not a defense. Restatement of Contracts, section 455.

In *Bryan* v. *Spurgeon,* 37 Tenn. (5 Sneed), 681, the court thought that the contingency should have been foreseen. *Officer* v. *Sims,* 49 Tenn. (2 Heisk.), 501, is irrelevant. An executed contract was involved. In *Thompson* v. *Warren,* 45 Tenn. (5 Cold.), 644, and *Mississippi & T. Railroad Co.* v. *Green,* 56 Tenn. (9 Heisk.), 588, a relaxation of the old rule was made, and performance was excused when the thing to be done became impossible by reason of law.

The complainants ask that we clarify our opinion in certain aspects. We have heretofore expressed our conclusions about as clearly as we are able to do.

In so far as the complainants sought a recovery for the balance due for the first fifty-year term, we awarded judgment. Defendants indeed conceded liability for the rent for that term and the only question was as to the amount due.

■■ As to the right of the complainants to enforce a renewal of the lease for another fifty-year term, the court simply refused to make any declaration. This course was followed upon authority of *Newsum* v. *Interstate Realty Co.,* 152 Tenn., 302, 278 S. W., 56, wherein it was said: "A declaratory judgment is essentially one

of construction. It is apparent from the history of the legislation providing for this procedure, as well as from the recitals of the Uniform Declaratory Judgments Act itself, that its primal purpose is the construction of definitely stated rights, status, and other legal relations, commonly expressed in written instruments, although not confined thereto, and, while determination of an issue of fact is authorized by section 9 of the act, the settlement of disputed facts at issue between the parties will ordinarily be relegated to the proper jurisdictional forums otherwise provided. Recognizing that the courts have a very wide discretion under these acts, which should be exercised with the utmost caution, it has been said by good authority that 'a declaration may properly be refused if it can be made only after a judicial investigation of disputed facts.' Freeman on Judgments, Vol. 3 (5th Ed.), section 1356, and see [Annotation], 12 A. L. R., 72.''

The foregoing was approved in *Harrell* v. *American Home Mortgage Co.,* 162 Tenn., 371, 36 S. W. (2d), 888.

We are unable to see that any grave injustice will be done to complainants if they fail to obtain a renewal of this lease. As we figure it, they have been paid upward of $270,000 for the property they parted with, which is no trifling consideration.

The petition to rehear is denied.