IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 27, 2009 Session

## JAMES K. PATTERSON, M.D., ET AL. v. METHODIST HEALTHCARE-MEMPHIS HOSPITALS

Direct Appeal from the Circuit Court for Shelby County
No. CT-002611-04      Karen R. Williams, Judge

No. W2008-02614-COA-R3-CV - February 2, 2010

The plaintiffs/appellants, two doctors, filed suit after they were deemed to have voluntarily relinquished their medical staff privileges at Methodist Healthcare-Memphis Hospitals for failure to maintain compulsory insurance coverage. The doctors' complaint and amended complaint alleged breach of contract, intentional interference with business relationships, common law retaliatory discharge, and violation of federal and state whistleblower statutes. In separate orders, the trial court dismissed the doctors' whistleblower and retaliatory discharge claims. The court later granted summary judgment in favor of the defendant on the remaining claims. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the Court, in which HOLLY M. KIRBY, J. and J. STEVEN STAFFORD, J., joined.

Robert L. Moore and Dawn Davis Carson, Memphis, Tennessee, for the appellants, James K. Patterson, M.D. and Rushton E. Patterson, Jr., M.D.

William L. Bomar, Memphis, Tennessee, for the appellee, Methodist Healthcare-Memphis, Hospitals.

## OPINION

### I. Background and Procedural History

The following facts are undisputed. The plaintiffs/appellants, James K. Patterson, M.D. and Rushton E. Patterson, Jr., M.D. ("doctors"), operated an obstetrical and gynecological practice located near Methodist Hospital-North in Memphis, Tennessee. The doctors first applied for and received medical staff privileges at Methodist Healthcare-Memphis Hospitals ("Methodist") in the

late 1980's.  Until October 2003, Methodist did not suspend, revoke, or terminate the doctors' privileges for any reason.  On October 23, 2003, Methodist notified the doctors it would deem their privileges voluntarily relinquished if the doctors did not provide proof of continuous and uninterrupted professional liability insurance without periods of non-coverage by October 27, 2003.[1] The doctors did not provide proof of the requisite insurance coverage and, as a result, were unable to continue treating patients at Methodist's facilities.

The doctors filed suit following the relinquishment of their privileges seeking compensatory and punitive damages.  The doctors' complaint and amended complaint alleged breach of contract, intentional interference with business relationships, common law retaliatory discharge, and violation of federal and state whistleblower statutes.  The gravamen of the doctors' complaint and amended complaint was that Methodist wrongfully terminated the doctors' privileges in retaliation for reports Dr. Rushton Patterson made regarding alleged TennCare and OmniCare fraud at Methodist Hospital-North.[2]  Methodist disputed the doctors' claims and, over the course of the proceedings, filed several motions to dismiss.  In separate orders, the trial court dismissed the doctors' whistleblower and retaliatory discharge claims.

Methodist filed a motion to dismiss and/or for summary judgment arguing that the doctors could not establish their remaining claims for breach of contract and intentional interference with

---

[1]In June 2001, Methodist's board of directors revised its bylaws to expressly require the maintenance of "continuous and uninterrupted professional liability insurance coverage, without periods of non-coverage, and including either extended reporting ('tail') or retroactive ('prior acts') coverage."  The prior version required medical staff to "maintain a minimum of one million dollars professional liability insurance from an insurance company licensed to do business in Tennessee."  The parties dispute whether the language of the revised bylaw imposed a heightened insurance requirement or confirmed the meaning of the prior version, but it is unnecessary to reach this question in the present appeal.

[2]It is undisputed that Dr. Rushton Patterson prepared a letter to then Governor Don Sundquist on June 20, 2002, complaining of an incident in which he "delivered an undocumented alien" while providing unpaid emergency services for Methodist Hospital-North.  Dr. Rushton Patterson asserted that illegal or undocumented aliens had been receiving tours of Methodist's facilities weeks in advance of their "emergency" deliveries.  This led him to believe that certain Methodist employees had entered into arrangements with human traffickers to facilitate deliveries at Methodist with intent to defraud Methodist's physicians of payment for their services.  Dr. Patterson later discovered that the complained of patient had obtained TennCare and OmniCare coverage for her and her child.  This patient filed a complaint against him with the hospital, which Methodist dismissed on September 13, 2002, following an internal investigation.  Dr. Patterson's letter to Governor Sundquist asserted:

> These people have successfully stolen services from me and the honest taxpayers of Tennessee.  This was done with the help of employees of state government as well as employees of Methodist Healthcare.  This represents a new twisted version of the American dream with illegal aliens smuggling family members into this country so the taxpayers can support them.  I sincerely hope that you will act to correct this problem.

business relationships.[3] On the breach of contract claim, Methodist submitted that its bylaws did not create an enforceable contract between the parties and, in the alternative, that the doctors first breached the contract. Methodist argued that the doctors' violations of hospital bylaws made the decision to relinquish their privileges an exercise of business judgment. Consequently, Methodist argued, the doctors could not establish the essential elements of intentional interference with business relationships, including the element of improper motive or improper means. Finally, Methodist submitted that the record was devoid of evidence of the alleged illegal alien incident, which it argued should be dismissed or denied as a supporting factor for the doctors' claims.

The trial court granted summary judgment in favor of Methodist.[4] While not explicitly addressing whether the bylaws were a contract, the court found that the doctors could not establish claims for breach of contract. The court concluded that the doctors: (1) knew of the revised bylaws, (2) acknowledged they were responsible for understanding the revised bylaws, and (3) agreed to abide by and be bound by the revised bylaws. The court further concluded that the doctors failed to carry their burden of production on the issues of tortious interference with business relationships and punitive damages. The doctors timely filed a notice of appeal.

## II. Issues Presented

The doctors limit their appeal to the trial court's grant of summary judgment. The doctors broadly frame the issues before this Court as whether the trial court erred in granting summary judgment in favor of Methodist and correspondingly whether there is a genuine issue of material fact that precludes a grant of summary judgment.[5] The determinative issues within these broader questions, as we perceive them, are:

(1)     Whether Methodist has established that the doctors first breached the parties' contract and are not entitled to recover damages, shifting the burden of production to the doctors;

---

[3]For brevity's sake, we will refer to the motion as a motion for summary judgment.

[4]Methodist filed a motion to alter or amend the court's initial order. The court granted Methodist's motion, vacated its initial order, and filed a modified order. The modified order deleted a notation and added a finding that "Plaintiffs acknowledged that they were responsible for knowing the contents of the by-laws and agreed to abide by and be bound by the then existing medical staff by-laws."

[5]In a separate section of their brief, the doctors argue that the trial court erroneously concluded there were no genuine issues of material fact. The doctors point to several disputed facts in the parties' briefs and other papers in support of their position; however, they recognize that courts should deny a properly supported motion for summary judgment only if *material* facts are in dispute. To determine whether disputed facts are material, we must first analyze the substantive issues to determine which facts are essential. We will therefore address the asserted issues of material fact within our analysis of the substantive claims.

(2)     Whether the doctors have demonstrated that a genuine issue of material fact exists that would preclude summary judgment on their claims for breach of contract;

(3)     Whether Methodist affirmatively negated the element of improper motive or improper means on the doctors' claims for intentional interference with business relationships, shifting the burden of production to the doctors;

(4)     Whether the doctors have demonstrated that a genuine issue of material fact exists that would preclude summary judgment on their claims for intentional interference with business relationships.

### III. Standard of Review

Tennessee Rule of Civil Procedure 56 provides that a party is entitled summary judgment only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. "The moving party has the ultimate burden of persuading the court that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 83 (Tenn. 2008) (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)). Accordingly, the burden to show that summary judgment is appropriate first rests with the moving party. *See id.* "The moving party may make the required showing and therefore shift the burden of production to the nonmoving party by either: (1) affirmatively negating an essential element of the nonmoving party's claim; or (2) showing that the nonmoving party cannot prove an essential element of the claim at trial." *Id.* (citation omitted). The nonmoving party has no duty to provide evidence to support its claim unless the moving party carries its initial burden. *Id.* (citations omitted).

A party will not succeed on a motion for summary judgment merely by asserting that the nonmoving party is without evidence to support its claim. *Id.* at 83-84 (citing *Byrd*, 847 S.W.2d at 215). "The moving party must either produce evidence or refer to evidence previously submitted by the nonmoving party that negates an essential element of the nonmoving party's claim or shows that the nonmoving party cannot prove an essential element of the claim at trial." *Id.* at 84 (citing *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 5 (Tenn. 2008)). Production of evidence that raises doubts about the merits of the nonmoving party's claim will not suffice. *Id.* (citing *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)). "[T]he moving party must point to evidence that tends to disprove an essential factual claim made by the nonmoving party." *Id.* (citing *Blair v. W. Town Mall*, 130 S.W.3d 761, 768 (Tenn. 2004)).

Once a moving party carries its initial burden, the focus of the inquiry shifts to the nonmoving party who must "produce evidence of specific facts establishing that genuine issues of material fact exist." *Id.* (citations omitted). The Tennessee Supreme Court has articulated four methods by which the nonmoving party can satisfy its burden of production and defeat a motion for summary judgment:

(1) pointing to evidence establishing material factual disputes that were over-looked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P., Rule 56.06.

*McCarley*, 960 S.W.2d at 588. Courts must accept the evidence proffered by the nonmoving party as true and resolve any doubts concerning the existence of a genuine issue of material fact in favor of the nonmoving party. *Martin*, 271 S.W.3d at 84 (citation omitted). "'A disputed fact is material if it must be decided in order to resolve the substantive claim or defense at which the motion is directed.'" *Id.* (quoting *Byrd*, 847 S.W.2d at 215). "A disputed fact presents a genuine issue if 'a reasonable jury could legitimately resolve that fact in favor of one side or the other.'" *Martin*, 271 S.W.3d at 84 (quoting *Byrd*, 847 S.W.2d at 215).

If the party moving for summary judgment bears the burden of proof at trial, the burden-shifting analysis differs. *Hannan*, 270 S.W.3d at 9 n.6. "For example, a plaintiff who files a motion for partial summary judgment on an element of his or her claim shifts the burden by alleging undisputed facts that show the existence of that element and entitle the plaintiff to summary judgment as a matter of law." *Id.* Likewise, a defendant can shift the burden of production to a non-moving plaintiff by alleging undisputed facts to show the existence of an affirmative defense. *Id.*

This Court reviews a trial court's decision on a motion for summary judgment *de novo* with no presumption of correctness. *Martin*, 271 S.W.3d at 84 (citing *Blair*, 130 S.W.3d at 763). We review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the favor of the nonmoving party. *Id.* (citing *Staples v. CBL & Assocs.*, 15 S.W.3d 83, 89 (Tenn. 2000)).

## IV. Analysis

### A. Breach of Contract

We first consider whether the trial court properly granted summary judgment to Methodist on the doctors' breach of contract claims.[6] Methodist argues that the doctors first breached the

---

[6]Methodist argued in support of its motion for summary judgment that its bylaws did not create an enforceable contract between the parties. The Tennessee Supreme Court in *Lewisburg Community Hospital, Inc. v. Alfredson*, 805 S.W.2d 756 (Tenn. 1991), determined as a matter of first impression that "a hospital's bylaws are an integral part of its contractual relationship with the members of its medical staff." *Id.* at 759 (citations omitted). In subsequent cases, there has been little doubt whether the bylaws governing a relationship between a hospital and its medical staff are contractually binding. *See, e.g.*, *City of Cookeville v. Humphrey*, 126 S.W.3d 897, 903 (Tenn. 2004); *Bryant v. Tenet, Inc.*, 969 S.W.2d 923, 926 (Tenn. Ct. App. 1997); *Eyring v. E. Tenn. Baptist Hosp.*, 950 S.W.2d 354, 356 (Tenn. Ct. App. 1997). But here the governing document expressly states that it "is not and shall not be deemed to be a contract." In its prior submissions,

(continued...)

parties' contract–the revised bylaws–and are not entitled to recover on their claims. It is well accepted that "[a] party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract." *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990) (citations omitted). The first material breach alleged in this case is the doctors' failure to maintain continuous and uninterrupted insurance without periods of non-coverage. There is substantial evidence in the record, much of it undisputed, to establish that the doctors consented to the terms of the contract, violated the terms of the contract, and were not excused from performing the contract.

The relevant bylaw required the doctors to maintain "continuous and uninterrupted professional liability insurance coverage, without periods of non-coverage, and including either extended reporting ('tail') or retroactive ('prior acts') coverage." As the bylaw suggests, a physician who changes insurance carriers may maintain the requisite coverage in one of two ways. First, the physician may purchase "tail" coverage from his previous carrier; tail coverage insures a physician for acts that occurred under an expiring insurance policy but are reported at a later date. Second, the physician may purchase "prior acts" coverage from a new carrier, which provides retroactive coverage to a date preceding the new policy's inception date. In either case, the physician is able to obtain insurance for procedures performed under a prior insurance policy that has lapsed, preventing uninsured gaps in coverage that might expose a hospital to liability.

It is undisputed that the doctors did not purchase tail or prior acts coverage upon changing insurance carriers at various points and, as a consequence, developed periods of non-coverage. Dr. James Patterson developed a gap in coverage from December 1, 2000, to December 1, 2001. Dr. Rushton Patterson developed more extensive gaps from July 8, 1985, to December 31, 1996, and from January 1, 1997, to December 31, 2001. The doctors developed these gaps because they affirmatively decided not to purchase tail or prior acts coverage. The record is replete with deposition testimony from Frederick Seilkop ("Mr. Seilkop"), the doctors' former insurance broker, explaining that the doctors consciously choose to develop gaps in their coverage for "economic reasons," often against the professional advice of others. In the late 1990's and early 2000's, Mr. Seilkop expressly advised the doctors to keep their retroactive coverage intact. The doctors nonetheless chose not to purchase tail or prior acts coverage despite understanding the implications of developing gaps.

The doctors' decisions not to purchase tail or prior acts coverage ensured it would be much more costly for them to cover their gaps in the future. According to Mr. Seilkop, once a physician allows his retroactive date to expire without purchasing tail coverage it becomes virtually impossible to fully cover preexisting gaps. Michael Blaum ("Mr. Blaum"), owner and president of Medical Risk

---

[6](...continued)

Methodist argued that such a disclaimer is not illegal or otherwise violative of Tennessee public policy. The parties' briefs, however, contain cursory discussion of this issue without citation to legal support on either side of the argument. We will assume, without deciding, that the bylaws are a contract. *See Lister v. Methodist Med. Ctr. of Oak Ridge*, 1993 WL 481402, at *1 (Tenn. Ct. App. Nov. 18, 1993).

Services, Inc., explained that allowing a gap in coverage to arise makes it difficult to obtain insurance coverage in the "standard" market. Specific to the doctors, Mr. Blaum testified in his deposition that their adverse claims histories and prior insurance decisions limited their ability to buy tail or prior acts coverage.

The costly nature of procuring tail or prior acts coverage with a preexisting gap was further exacerbated by difficulties in the insurance market following the terrorists attacks of September 11, 2001. Blayne Burns ("Ms. Burns"), Methodist's corporate director of risk, finance, and insurance, described September 11th as a "significant date for every type of insurance including medical malpractice insurance." The insurance market became a "hard market" and many insurance carriers went out of business including one of the largest writers of medical malpractice insurance. Mr. Blaum added, "It was the largest insurance loss in the history of the world, and it adversely affected all the reinsurance markets, and the reinsurance markets are responsible for providing insurance to the individual physician insurance companies, so they had to pass their losses on to the physician insurance companies." Methodist notified its doctors of the potential fallout in a newsletter dated January 2002, which it forwarded to all doctors' offices and posted in its medical lounges. The newsletter notified staff members of the possibility of non-renewal as a result of the hard market, reminded them of Methodist's compulsory insurance requirements, and provided them with a list of insurance professionals to contact should difficulties arise.

Several months later, the doctors applied for reappointment with Methodist. By the doctors' own admissions, they understood at this time they had an obligation to purchase tail coverage and knew it would be "very expensive" to cover their gaps. The doctors nonetheless applied for reappointment with Methodist and agreed to abide by Methodist's bylaws. Each doctor signed and dated an application that expressly stated:

> I further acknowledge that I am responsible for knowing the contents of the bylaws, rules and regulations of the Organizations and their medical/professional staffs and agree to be bound by them if granted membership and/or privileges or affiliation.
>
> . . . .
>
> I further acknowledge that I have read and understand the foregoing Authorization and Release.

Thus, there is no genuine issue of material fact as to whether the doctors agreed to purchase continuous and uninterrupted insurance with periods of non-coverage as a condition of exercising privileges at Methodist.

The doctors nevertheless argue that the parties' contract did not include an obligation to purchase tail coverage or that their performance of this obligation was excused. The doctors first argue that Methodist unilaterally imposed the revised insurance requirements, but we find no

evidence to support this argument.[7] In order to form a valid contract, both parties must assent to its terms. *Johnson v. Central Nat'l Ins. Co. of Omaha, Neb.*, 356 S.W.2d 277, 281 (Tenn. 1962). Similarly, the modification of an existing contract is enforceable only when accomplished with the mutual assent of both parties. *Buchholz v. Tenn. Farmers Life Reassurance Co.*, 145 S.W.3d 80, 84 (Tenn. Ct. App. 2003) (citation omitted); *Galbreath v. Harris*, 811 S.W.2d 88, 92 (Tenn. Ct. App. 1990). Methodist has demonstrated that the doctors assented to the terms of the revised bylaws. The doctors have failed to produce evidence to show that they did not assent to the terms of the relevant bylaw when they submitted their applications for reappointment. The doctors have equally failed to produce evidence to show that the Board of Directors improperly adopted the resolution. Dr. James Patterson instead testified in his deposition that he did not complain about the revision in the relevant bylaw because "there was nothing to complain about." We are unable to find any evidence to show that the Methodist imposed the revised insurance requirement on the doctors without their individual consent.

The doctors next argue that Methodist agreed to exclude the revised insurance requirement from their contract by accepting their applications for reappointment. This argument is contrary to the express terms of their applications, inconsistent with the terms of the bylaws included in the record, and not supported by citation to any testimony or other evidence. There is no citation to evidence in the record to show that the parties negotiated a contract other than that represented by the bylaws in effect. Further, there is no evidence in the record to suggest that Methodist actually had knowledge of the gaps when it approved the doctors' applications for reappointment.

In their sworn affidavits, the doctors stated that they disclosed the gaps in their tail coverages to Methodist. The affidavits, however, do not indicate when or how this purported "disclosure" occurred. It becomes clear upon review of the doctors' deposition testimony, statement of undisputed facts, and other papers that their "disclosure" did not specifically identify the existence of gaps in their coverage; rather, the doctors at various points signed releases that allowed Methodist to contact their insurance providers and provided certificates of insurance coverage that indicated their policies' effective dates.[8] And it is undisputed that the certificates of insurance and

---

[7]There is some suggestion that Methodist changed its bylaws with an intent to terminate the doctors' privileges. We find no support for this argument. The only evidence on this issue demonstrates that Methodist was not specifically aware that the revision might disqualify any of its physicians. Further, the revision occurred well before the alleged illegal alien incident, which is the only proffered basis of retaliation.

[8]For example Dr. Rushton Patterson and counsel for Methodist had the following exchange regarding the doctors' "disclosures":

Question: "Now, in your discovery responses and pleadings and statements by your lawyers, they have indicated or you have indicated that you disclosed to Methodist and its employees the existence of these gaps at various times in the past; is that right?"

(continued...)

reappointment applications did not indicate whether there were existing gaps in the doctors' insurance coverages. Further, the only testimony on this issue was that Methodist did not have procedures in place prior to 2003 to catch gaps in coverage. Thus, accepting as true that the doctors "disclosed" their gaps – i.e. signed releases to allow Methodist to contact their insurance providers and provided Methodist with certificates of insurance coverage–there is absolutely nothing to suggest that the objective manifestations of the parties showed that either party intended to exclude the revised bylaw from the parties' contract. *See Moody Realty Co. v. Huestis*, 237 S.W.3d 666, 674 (Tenn. Ct. App. 2007) ("Courts determine mutuality of assent by assessing the parties' manifestations according to an objective standard."). Rather, the objective manifestations of the parties indicated that the doctors would be bound by the revised bylaws.

The doctors next submit that, even if they agreed to the revised bylaws, their performance should be excused due to the impossibility or impracticability of procuring tail coverage following the attacks of September 11th. The doctors cite this Court's decision in *Groner v. On-Site Grading, Inc.*, No. E1999-00219-COA-R3-CV, 2000 WL 502843 (Tenn. Ct. App. Apr. 28, 2000), for the proposition that "failure to perform a contract is excused if performance becomes impossible due to a cause not attributable to the non-performing party and the impossibility is 'not among the probable contingencies which a man of ordinary prudence should have foreseen and provided for.'" *Id.* at *4 (quoting *Wilson v. Page*, 325 S.W.2d 294, 298 (Tenn. Ct. App. 1958) (italics omitted)). The rule of law cited, while good law, pertains to the rule of supervening impracticability whereby the occurrence of an unforseen circumstance following the formation of the contract excuses a party's performance. *See* Restatement (Second) of Contracts § 261 (1981); 30 Richard A. Lord, *Williston on Contracts* § 77:16 (4th ed. 2004).

More pertinent to the current discussion is the similar rule of existing impracticability.[9] The Restatement (Second) of Contracts states the rule of existing impracticability as follows:

> Where, at the time a contract is made, a party's performance under it is impracticable

---

[8](...continued)
Answer: "Define disclose."

Question: "Tell them about, tell Methodist or an authorized corporate representative of Methodist about the gaps in your Tail coverage?"

Answer: "No, those were apparent when my insurance information was sent to y'all and you investigated it as you do for every renewal."

[9]The comments to the Restatement recognize that although this rule is "sometimes phrased in terms of 'impossibility,' it has long been recognized that it may operate to discharge a party's duty even though the event has not made performance absolutely impossible." Restatement (Second) of Contracts § 261 cmt. d (1981). The Tennessee Supreme Court has agreed that the rule is one of "impracticability" rather than actual "impossibility." *See North Am. Capital Corp. v. McCants*, 510 S.W.2d 901, 905 (Tenn. 1974) (citing *Hinchman v. City Water Co.*, 167 S.W.2d 986, 991 (Tenn. 1943)).

-9-

without his fault *because of a fact of which he has no reason to know and the non-existence of which is a basic assumption on which the contract is made*, no duty to render that performance arises, unless the language or circumstances indicate the contrary.

Restatement (Second) of Contracts § 266(1) (1981) (emphasis added). The comments to the Restatement explain that "[a] party's performance may be as easily affected by impracticability existing at the time the contract was made, because of some fact of which he was ignorant, as by supervening impracticability." Restatement (Second) of Contracts § 266 cmt. a (1981). It is essential, however, that "*the affected party must have had no reason to know at the time the contract was made of the facts on which he later relies*." *Id.* (emphasis added).

The doctors cannot avoid their contractual obligation to procure tail coverage in the present case because it is undisputed that they knew of or had reason to know of the existing difficulties in the insurance market when they agreed to be bound by the hospital bylaws.[10] The complained of deterioration in the insurance markets indisputably occurred in late 2001 and early 2002. The doctors nonetheless agreed to procure the requisite insurance coverage when they subsequently applied for reappointment pursuant to hospital bylaws. As the Tennessee Supreme Court has stated, "A man may contract to do what is impossible, as well as what is difficult, and be liable for failure to perform." *Hinchman v. City Water Co.*, 167 S.W.2d 986, 991 (Tenn. 1943) (quoting Williston on Contracts (Revised Ed.), Vol. 6, p. 5410). If the doctors contracted to do the impossible, they have produced no evidence to demonstrate that their failure to perform was excusable. We hold that the doctors were bound to purchase and maintain continuous and uninterrupted professional liability insurance without periods of non-coverage.

Having concluded that the doctors were bound to the terms of the revised bylaws, it is clear that the doctors first breached the parties' contract. It is undisputed that the doctors did not comply with the revised insurance requirement. It is undisputed that the doctors' alleged breaches occurred prior to the relinquishment of their privileges in October of 2003. With these undisputed facts, Methodist has demonstrated that the doctors breached the contract between them by failing to maintain continuous and uninterrupted insurance coverage without periods of non-coverage. Methodist therefore met its burden to establish first breach. Summary judgment is appropriate unless the doctors can establish a genuine issue of material fact that would preclude summary judgment or otherwise demonstrate that summary judgment is inappropriate as a matter of law.

The doctors are unable to establish a genuine issue of material fact on the issue of first breach. The doctors have presented no specific facts, which if accepted as true, show that they did not understand or consent to the terms of the revised bylaws. It is undisputed that the doctors agreed

---

[10]The doctors attempt to frame the issue as whether Methodist gave them a reasonable period of time after October 23, 2003, to obtain coverage. The letter of notice, however, did not ask the doctors to obtain coverage but to provide proof that they were in compliance with the existing bylaws. Thus, we disagree that the issue before us is whether it was practicable for the doctors to find coverage in less than a week.

to the bylaws and agreed to carry out the duties imposed on them in exchange for staff privileges. They have presented no specific facts to establish that Methodist breached the parties' contract prior to their initial breach. They have not argued or presented specific facts to show that they were entitled to notice, an opportunity to cure, or administrative review prior to the relinquishment of their privileges.[11] In sum, they have pointed to nothing in the record that raises a genuine issue of material fact on the question of first breach.

The doctors nonetheless argue that Methodist is not entitled to judgment as a matter of law because it waived or should be equitably estopped from asserting their first breach. "'A waiver is an intentional relinquishment of a known right.'" *Jenkins Subway, Inc. v. Jones*, 990 S.W.2d 713, 722 (Tenn. Ct. App. 1998) (quoting *Baird v. Fidelity-Phenix Fire Ins. Co.*, 162 S.W.2d 384, 388 (Tenn. 1942)).

> Waiver may be proved by express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by a course of acts and conduct, or by so neglecting and failing to act, as to induce a belief that it was [the party's] intention and purpose to waive. In order to establish waiver by conduct, the proof must show some absolute action or inaction inconsistent with the claim or right waived.

*Id.* at 722-23 (citations omitted) (alteration in original) (internal quotation marks omitted).

The essential elements of equitable estoppel, on the other hand, are:

> (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) Intention, or at least expectation that such conduct shall be acted upon by the other party; [and] (3) Knowledge, actual or constructive[,] of the real facts.

*Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 315-16 (Tenn. 2009) (alterations in original) (quoting *Werne v. Sanderson*, 954 S.W.2d 742, 745-46 (Tenn. Ct. App. 1997)).

---

[11] The bylaws in their entirety are not found in the record. The only evidence on the question of whether Methodist acted pursuant to its bylaws when it deemed the doctors' privileges voluntarily relinquished indicates that Methodist had the right to act immediately. It is not clear whether the doctors were entitled to notice, a hearing, or other process before the relinquishment of their privileges. The doctors have not argued or presented evidence to establish any such right. Further, the doctors have not properly challenged the validity of the revised insurance requirement or the procedures by which Methodist enacted the requirement. The only such argument is found in a single, unsupported assertion in their brief that the alleged "change" in the bylaws was made "without notice or input from [the doctors]."

The doctors' position is that Methodist learned of their gaps in coverage subsequent to the renewal of their privileges and failed to act until October 2003. Assuming the evidence provided by the doctors is true, it appears that Methodist learned of gaps in both doctors' insurance coverages in late 2002. The fact that Methodist discovered the gaps some months prior to the relinquishment of the doctors' privileges does not persuade this Court that Methodist waived its right to enforce the breach of the parties' contract or that Methodist should be estopped from asserting the breach. Waiver is not applicable under the circumstances because Methodist did not neglect its rights or so fail to act as to induce the belief that it was Methodist's intention and purpose to waive the breach. Estoppel does not apply because there is no conduct that amounts to a false representation or concealment of material facts. Further, there is no conduct calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which Methodist now relies. There is no evidence to indicate that Methodist in any way intended to relieve the doctors of their respective obligations to maintain the requisite coverage or exhibited conduct conveying that impression.

For these reasons, we hold that Methodist is entitled to summary judgment on the doctors' claims for breach of contract. Assuming the bylaws were a contract, the doctors assented to and agreed to be bound by the revised terms of the bylaws, including the requirement to procure continuous and uninterrupted insurance without periods of non-coverage. It is undisputed that the doctors did not procure the requisite coverage, breaching the parties' contract. There is no genuine issue of material fact as to whether the doctors' breach occurred before Methodist deemed their privileges voluntarily relinquished. Under the rule of first breach, the doctors are not entitled to recover for damages arising out of a later breach. The trial court's grant of summary judgment on the doctors' breach of contract claims is affirmed.

### B. Intentional Interference with Business Relationships

We next consider whether the trial court properly granted summary judgment to Methodist on the issue of intentional interference with business relationships. The Tennessee Supreme Court expressly adopted the tort of intentional interference with business relationships in *Trau-Med of America, Inc. v. Allstate Insurance Co.*, 71 S.W.3d 691 (Tenn. 2002). The elements of the tort as set forth in *Trau-Med* are:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's *improper motive or improper means*; and finally, (5) damages resulting from the tortious interference.

*Id.* at 701 (citations omitted) (footnotes omitted).

The trial court generally concluded that the doctors could not establish the essential elements of their claim. Our review of the record shows that Methodist raised substantial doubt as to whether

-12-

the doctors demonstrate the first through third elements of intentional interference with business relationships. Genuine issues of material fact nevertheless exist as to whether Methodist knew of an existing business relationship between the doctors and patients with Methodist-only health plans and intended to cause termination of that relationship in retaliation for reports of TennCare and OmniCare fraud. Additionally, Methodist did not argue that the doctors could not establish the element of damages. We will therefore focus our review on the fifth element of the doctors' claim – improper motive or improper means.

In order to shift the burden of production on this issue to the doctors, Methodist must affirmatively negate or show that the doctors cannot establish the existence of both improper motive and improper means. *See Watson's Carpet and Floor Coverings, Inc. v. McCormick,* 247 S.W.3d 169, 176 (Tenn. Ct. App. 2007) (citing *Trau-Med*, 71 S.W.3d at 701). Methodist can meet its burden on the question of improper motive if it demonstrates that the doctors cannot show that Methodist's predominant purpose in relinquishing their privileges was to injure the doctors. *See Trau-Med*, 71 S.W.3d at 701 n.5 (citing *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 307-08 (Utah 1982)). With respect to improper means, Methodist must establish that its conduct was not inappropriate in light of the circumstances. *Id.* While recognizing that impropriety in a given case is a fact-intensive inquiry, the supreme court in *Trau-Med* offered, as guidance, a non-exhaustive list of improper means including the following:

> means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules; violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship; and those methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition.

*Id.* (citations omitted).

A showing of impropriety is essential in a case for intentional interference with business relationships. Our supreme court in *Trau-Med* imposed the element of improper motive or improper means to guard against a principal evil: the potential degradation of free market principles "by holding liable those individuals engaged in legitimate business practices." *Id.* at 699-700. With its decision, Tennessee joined a majority of jurisdictions to have "restructured the elements of the tort to add the requirement of proof of improper conduct extending beyond the bounds of doing business in a freely competitive economy." *Id.* at 700. The restructured tort balances society's desire to encourage free enterprise with its desire to discourage impermissible business conduct:

> The theory of the tort of interference, it is said, is that the law draws a line beyond which no member of the community may go in intentionally intermeddling with the business affairs of others; that if acts of which complaint is made do not rest on some legitimate interest, or if there is sharp dealing or overreaching or other conduct below

the behavior of fair men similarly situated, the ensuing loss should be redressed; and that the line of demarcation between permissible behavior and interference reflects the ethical standards of the community.

*Id.* at 701-02 (quoting *City of Rock Falls v. Chi. Title & Trust Co.*, 300 N.E.2d 331, 333 (Ill. App. Ct. 1973)).

This Court in *Watson's Carpet and Floor Coverings, Inc. v. McCormick,* 247 S.W.3d 169 (Tenn. Ct. App. 2007), accordingly recognized that the tort of intentional interference with business relationships "should not be interpreted in such a way as to prohibit or undermine the ability to contract freely and engage in competition." *Id.* at 178. We noted that "[i]t is a principle of long standing in Tennessee that the 'general rule [is] that a person engaged in business may, at his election, and without good reason, refuse to deal with some other person.'" *Id.* (alteration in original) (quoting *Crumley v. Watauga Water*, Co., 41 S.W. 1058, 1059 (Tenn. 1897)) (citing *Harrell v. Dean Food Co.*, 619 S.W.2d 528, 533 (Tenn. Ct. App. 1981)). "In other words, in Tennessee, a person has the freedom or unfettered discretion to do business or not to do business with whomever he or she chooses for any reason that does not violate the law."

We cited with approval the Restatement (First) of Torts § 762, which many jurisdictions consider viable in the context of interference with business relationship claims. *Id.* at 179 (citing *Van Natta Mech. Corp. v. Di Staulo*, 649 A.2d 399 (N.J. Super. Ct. App. Div. 1994); *Circo v. Spanish Gardens Food Mfg. Co.*, 643 F. Supp. 51 (W.D. Mo. 1985)). The Restatement (First) of Torts § 762 provides:

One who causes intended or unintended harm to another merely by refusing to enter into a business relation with the other or to continue a business relation terminable at his will is not liable for that harm if the refusal is not

(a) a breach of the actor's duty to the other arising from the nature of the actor's business or from a legislative enactment, or

(b) a means of accomplishing an illegal effect on competition, or

(c) part of a concerted refusal by a combination of persons of which he is a member.

Restatement (First) of Torts § 762 (1939). The comments to the Restatement explain that a refusal to deal is valid "regardless of the actor's motive for refusing to enter business relations with the other and even though the sole motive is a desire to harm the other." Restatement (First) of Torts § 762 cmt. c (1939).

Although the "refusal to deal" privilege does not squarely apply in the present factual context, it nonetheless affirms that private parties operating for profit maintain considerable discretion to refuse to enter into or continue a business relationship. The relationship between the hospital and

the doctors is just that: a symbiotic business relationship for profit governed by a contract. The question here is how much discretion either party has in terminating that relationship pursuant to the express terms of the parties' contract. Thus, it becomes essential to determine where the line of demarcation between permissible behavior and impropriety lies in light of the parties' existing relationship.

As we determine where the line of demarcation lies in the present case, we pause to acknowledge the nature of a hospital's decision to enact and enforce bylaws. The Tennessee Supreme Court has recognized that "[a] hospital's business judgment . . . is due great deference." *City of Cookeville v. Humphrey*, 126 S.W.3d 897, 905 (Tenn. 2004) (citing *Armstrong v. Bd. of Dirs. of Fayette County General Hosp.*, 553 S.W.2d 77, 79 (Tenn. Ct. App. 1976)). To this point, the board of directors at a hospital is vested with " a large measure of management discretion in the selection of members of the medical staff of a hospital" and "has the authority to promulgate reasonable rules and regulations as pertain to staff members and their privileges." *Armstrong*, 553 S.W.2d at 79 (citation omitted). Methodist maintains that it deemed the doctors' privileges voluntarily relinquished pursuant to hospital bylaws for a legitimate business reason: managing the hospital's risk exposure.[12] It argues that the doctors cannot show, as a matter of law, that Methodist's predominant purpose in enforcing its bylaws was to injure the doctors or that Methodist used improper means to relinquish the doctors' privileges.

We agree that the enactment and enforcement of the relevant bylaw was to a large degree an exercise of business judgment. Methodist enacted this particular bylaw after it was forced to settle a lawsuit originally filed against a physician who developed gaps in coverage because he changed insurance carriers. The physician was discovered to have gaps in insurance only after the filing of suit. Prior to that lawsuit, Methodist "never had a situation where it was brought to [its] attention that there could be gaps." The revised bylaw was enacted specifically to address doctors who allow gaps in their professional liability coverage to arise thereby exposing Methodist to increased risk. As Methodist explained, the revised bylaw is important to the management of risk at the hospital for three reasons: (1) Methodist's risk of exposure increases if a physician has a gap in insurance coverage, (2) allowing physicians to remain on staff without continuous coverage adversely affects Methodist's ability to obtain coverage in the commercial market, and (3) choosing not to enforce its bylaws would give incentive to other physicians to allow gaps in coverage to arise.

We conclude that Methodist acted pursuant to a valid business objective when it enacted and enforced revised bylaws requiring members of its staff to maintain a minimum level of insurance coverage. Its decision represents a deliberate decision to limit the number of physicians authorized to treat patients at its facilities in exchange for increased protection against liability for medical

___

[12]Methodist does not argue that its enforcement of hospital bylaws is not subject to review. *See Baptist Health v. Murphy*, 226 S.W.3d 800, 811 (Ark. 2006) (discussing the application of the "rule of non-review" to decisions concerning medical staff eligibility); *see generally Barrows v. Nw. Mem'l Hosp.*, 525 N.E.2d 50 (Ill. 1988) (analyzing various approaches to the review of hospital staff decisions).

malpractice.[13]  In effect, Methodist chose to "do business" with only those physicians who do not pose an unacceptable threat of liability.  In this case, Methodist determined that the doctors, by violating the terms of hospital bylaws, posed an unacceptable threat of liability.  Even if we draw the inference that Methodist initiated review of the doctors' coverages in retaliation for reports Dr. Rushton Patterson made about alleged TennCare and OmniCare fraud, it is undisputed that the doctors did not maintain continuous interrupted insurance without periods of non-coverage.  Even if the relinquishment of the doctors' privileges did not change the immediate risk exposure of the hospital for their prior procedures, their relinquishment acted as general deterrence to medical personnel on staff who might have similarly attempted to maintain privileges without acquiring tail or retroactive coverage.

We hold that Methodist has carried its initial burden on the improper means or motive element of the doctors' claim for intentional interference with business relationship. Methodist acted consistent with its bylaws and the contract between the parties when it dismissed the doctors; it did not use improper means to rescind the doctors' privileges.  Further, the doctors cannot show as a matter of law that the predominant purpose was to injure the doctors and not a valid business decision of the hospital to limit its risk exposure.

The doctors have failed to create a genuine issue of material fact on this issue.  It is undisputed that six other doctors voluntarily relinquished their privileges for failure to maintain continuous coverage.  Further, it is undisputed that the reinstatement of the doctors' privileges at Methodist is contingent on the purchase of the requisite insurance.  It has not been suggested that Methodist would refuse to permit the doctors to regain their privileges if they purchased the requisite coverage.  The fact that Methodist Healthcare-Fayette Hospital, an admittedly "separate entity under the Methodist LeBonheur Healthcare corporate umbrella," granted a waiver of a similar insurance requirement is irrelevant to whether the doctors were entitled to waiver.[14]  Because the doctors have failed to raise a genuine issue of material fact that would preclude summary judgment, the trial

_____

[13]The doctors concede this point in an intended jab found in their reply brief: "It is very basic, Methodist is more worried that they might be sued for gaps in their prior tail coverage or their insurance premiums might go up for having someone on their staff than for patient care."  While we express no comment on the doctors' characterization of Methodist's motive, their point is well-taken.  Methodist's decision to limit the number of doctors available to serve patients at its hospital is ultimately a business decision.  If patients are dissatisfied with the level of care they receive at Methodist due to the elimination of physicians with gaps in their insurance coverages, they are free to engage with physicians who practice elsewhere and to purchase insurance that will allow them to obtain services at another hospital.

[14] If anything, this example supports Methodist's argument that the decision to relinquish the doctors' privileges was a business decision.  Methodist Healthcare-Fayette Hospital indisputably granted its waiver based on the need for a physician's services in a medically under-served area of Fayette County. Presumably, the hospital granted the waiver after weighing the risks associated with allowing the doctor to remain on staff against the need for his services.  It is not at all clear that the hospital would have reached a similar conclusion if it was located in a community such as Memphis where the supply of physician care is not as limited.

court's holding on this issue is affirmed.

### V. Conclusion

For the foregoing reasons, we affirm the grant of summary judgment to Methodist on the doctors' claims for breach of contract, intentional interference with business relationships, and punitive damages in favor of Methodist.  Costs of this appeal are assessed to the appellants, James K. Patterson, M.D. and Rushton E. Patterson, Jr., M.D., and their surety for which execution may issue if necessary.

_____

DAVID R. FARMER, JUDGE