IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 27, 2012  Session

**E. RON PICKARD and LINDA PICKARD, as TRUSTEES OF THE
SHARON CHARITABLE TRUST and as INDIVIDUALS  v.
TENNESSEE DEPARTMENT of ENVIRONMENT AND CONSERVATION,
TENNESSEE WATER QUALITY CONTROL BOARD and TENNESSEE
MATERIALS CORPORATION**

**Direct Appeal from the Chancery Court for Davidson County
No. 09-2298-III      Ellen H. Lyle, Chancellor**

_____

**No. M2011-02600-COA-R3-CV - Filed September 4, 2012**

_____

The Tennessee Department of Environment and Conservation issued a draft permit allowing a proposed rock quarry to discharge storm water and wastewater into a nearby creek. Owners of property allegedly affected by the discharge filed a declaratory order petition with the Water Quality Control Board, seeking a declaration construing the rules regarding the protection of existing uses of waters. The Water Quality Control Board dismissed the petition as not ripe. The Tennessee Department of Environment and Conservation subsequently issued a final permit to the quarry and the property owners filed both a permit appeal and another declaratory order petition with the Water Quality Control Board. The Water Quality Control Board again dismissed the declaratory order petition. The property owners subsequently filed a petition for a declaratory judgment in the Davidson County Chancery Court. The Water Quality Control Board and the Tennessee Department of Environment and Conservation argued that the petition was not ripe and that the property owners had not exhausted their administrative remedies. In addition, the Water Quality Control Board and the Tennessee Department of Environment and Conservation argued that Tennessee Code Annotated Section 69-3-105(i) precluded the property owners from bringing a declaratory order petition prior to issuance of a permit.  The trial court ruled in favor of the property owners and issued a declaratory judgment on the construction of Tennessee Compiled Rule and Regulation 1200-04-03-.06. We affirm the trial court's rulings with regard to ripeness, exhaustion of administrative remedies, and Tennessee Code Annotated Section 69-3-105(i), but reverse the grant of summary judgment on the construction of Tennessee Compiled Rule and Regulation 1200-04-03-.06 and remand for further proceedings.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Affirmed
in Part; Reversed in Part; and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and RICHARD H. DINKINS, J., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; Elizabeth Parker McCarter, Senior Counsel; and R. Stephen Jobe, Senior Counsel, for appellants, Tennessee Water Quality Control Board.

Robert J. Martineau, Jr. And Patrick N. Parker, Nashville, Tennessee, for the Appellant, Tennessee Department of Environment and Conservation.

Elizabeth L. Murphy, W. David Bridgers, and Robert Anthony Peal, Nashville, Tennessee, for the appellees, E. Ron Pickard and Linda Pickard as Trustees for the Sharon Charitable Trust and as Individuals.

**OPINION**

**I. Background**

The subject matter in this case has been the subject of a separate appeal to this Court in *Pickard v. Tennessee Department of Environment and Conservation,* M2011-01172-COA-R3-CV, 2012 WL 3329618 (Aug. 14, 2012) (hereinafter, "*Pickard I*"). Because the underlying facts of these cases are the same, we take the facts from our prior opinion:

> Plaintiffs/Appellees Ron and Linda Pickard are the Trustees of the Sharon Charitable Trust ("the Trust," and together with Mr. Pickard and Mrs. Pickard, "Appellees"). The Trust is a non-profit corporation managing the Horse Creek Wildlife Sanctuary and Animal Refuge ("the Sanctuary") in Hardin County, Tennessee. The Sanctuary is a recreation area open to the public for fishing, camping, and other outdoor activities. Horse Creek runs through the property.
>
> This lawsuit involves the planned construction of a rock quarry in an undeveloped parcel adjacent to the Sanctuary ("the Quarry"). The Quarry will be owned and operated by Tennessee Materials Corporation. In order to begin construction, the Quarry applied for a Nationwide Pollution Discharge Elimination System discharge permit ("the permit") from the Tennessee Department of Environment and Conservation ("TDEC"). The Quarry applied for a permit in order to discharge

wastewater and storm water from the Quarry into an unnamed tributary of Horse Creek, which runs onto the Sanctuary's property, near recreational areas.

Pursuant to the request for a permit, Amy Fritz, a biologist for TDEC's Jackson field office, conducted a standard stream health survey of a segment of Horse Creek in accordance with TDEC's Quality System Standard Operating Procedures for Macroinvertebrate Stream Surveys ("Standard Operating Procedures"). The purpose of the stream survey was to evaluate the "biological integrity" parameter of the water quality standards for waters classified for fish and aquatic life in accordance with the Standard Operating Procedures. Ms. Fritz's survey of the segment of Horse Creek that would be directly affected by discharge from the Quarry yielded a Biological Index Score of 30. According to the Standard Operating Procedures, this Biological Index Score meant that Horse Creek was slightly impaired, or not fully supporting its classified uses for aquatic life. The survey also revealed that the stream bed was suffering the effects of bank instability and that the bed scored below the habitat assessment guideline for maintaining habitat protective of aquatic life. The survey yielded a habitat score of 127, meaning that Horse Creek is moderately impaired with regard to habitat.

Notwithstanding Ms. Fritz's findings, TDEC issued a draft permit to the Quarry in August 2008. A draft permit is merely a tentative determination and serves to notify the public of a planned discharge. Only after the draft permit is made public and citizens are given the opportunity to comment on the draft, will a final permit be issued. The draft permit proposed to allow the Quarry to discharge wastewater and storm water into an unnamed tributary of Horse Creek. The draft permit limited the frequency of discharges, however, and also placed limitations on the characteristics of the discharged wastewater. For example, Total Suspended Solids, or sediment, were limited to 40.0 milligrams per liter for any one day, and pH was similarly limited to 6.0 to 9.0 standard units. Other limitations regarding visible scum, oil, or other potentially hazardous discharges were further outlined. The draft permit, however, stated that Horse Creek did not qualify as "Exceptional

-3-

Tennessee Waters"[1] under the state Antidegradation regulations[2] and concluded that "[t]herefore, the materials reviewed indicate that 'available conditions' exist in the receiving stream." The draft permit made no mention of the adverse results of the stream survey, including the findings regarding impaired aquatic life and habitat.

---

[1] Tennessee Compiled Rules and Regulations Rule 1200.04.03.06(4)(a) provides that waters will be classified as "Exceptional Tennessee Waters" if any of the following criteria are met:

1. Waters within state or national parks, wildlife refuges, forests, wilderness areas, or natural areas;
2. State Scenic Rivers or Federal Wild and Scenic Rivers;
3. Federally-designated critical habitat or other waters with documented nonexperimental populations of state or federally-listed threatened or endangered aquatic or semi-aquatic plants, or aquatic animals;
4. Waters within areas designated as Lands Unsuitable for Mining pursuant to the federal Surface Mining Control and Reclamation Act where such designation is based in whole or in part on impacts to water resource values;
5. Waters with naturally reproducing trout;
6. Waters with exceptional biological diversity as evidenced by a score of 40 or 42 on the Tennessee Macroinvertebrate Index (or a score of 28 or 30 in subecoregion 73a) using protocols found in TDEC's 2006 Quality System Standard Operating Procedure for Macroinvertebrate Stream Surveys, provided that the sample is considered representative of overall stream conditions; or
7. Other waters with outstanding ecological, or recreational value as determined by the department. When application of this provision is a result of a request for a permit, such preliminary determination is to be made within 30 days of receipt of a complete permit application.

If waters are classified as "Exceptional Tennessee Waters:"

[N]o degradation will be allowed unless and until it is affirmatively demonstrated to the Department, after full satisfaction of the following intergovernmental and public participation provisions, that a change is justified as a result of necessary economic or social development and will not interfere with or become injurious to any classified uses existing in such waters.

Tenn. Comp. R. & Reg. 1200.04.03.06(4)(c).

[2] According to TDEC, Antidegradation policy is to establish a greater level of protection for those waters that are identified to be of high quality.

The draft permit was made public and concerned citizens were given the opportunity to comment either in writing or at public hearings. The Appellees participated in the commenting process. A summary of the comments issued by TDEC provides:

> Commenter said that Horse Creek has aquatic life . . . that was not properly evaluated or considered in this permit.

> Commenter said that the antidegradation regulations have not been followed or met with regard to this proposed permit or by the applicant in the application process. Horse Creek was improperly identified as not qualifying as "exceptional waters," as the biological and deliberative process were flawed and inadequate, failing to consider the actual conditions and uses.

*Pickard I*, 2012 WL 3329618, at *1–2.

## II. Proceedings before the Water Quality Control Board

As is relevant to this case, the Appellees filed a Petition for a Declaratory Order[3] with the Tennessee Water Quality Control Board ("the Board," and together with TDEC, "Appellants") on January 14, 2009, prior to the completion of the public comment period and issuance of a final permit. As we stated in *Pickard I*:

> The Appellees alleged that the permit application and draft permit contained inadequacies that prevented a proper application by TDEC. The Appellees further alleged that TDEC misapplied the Antidegradation rule and thereby mistakenly failed to conclude that the impairments revealed by the stream

---

[3] This case concerns the proper application of the Uniform Administrative Procedures Act to a petition for declaratory relief. As such the phrases "declaratory order" and declaratory relief" will be used throughout this decision. For clarity, we note that the phrase "declaratory order," as it is used throughout this opinion, refers to the type of declaratory relief that may be issued by the agency, here the Board. *See* Tenn. Code Ann. § 4-5-223. In contrast, the phrase "declaratory judgment" refers to the type of declaratory relief that may be rendered by the Chancery Court. *See* Tenn. Code Ann. § 4-5-225.

survey meant that there were unavailable conditions[4] in Horse
Creek warranting greater protections.

*Pickard I*, 2012 WL 3329618, at *2.

TDEC moved to dismiss the petition and the Board entered an order dismissing the case on February 18, 2009. The order stated:

> The Board declines to convene a contested case at this time
> based on the stipulated fact that the permit at issue has not been
> issued or denied therefore there is no final administrative action
> by the [TDEC].
>
> *   *   *
>
> **REASONS FOR DECISION**
>
> This ORDER of the Board is entered to maintain the
> delegated responsibilities of the Division and the Board; to
> prevent against the Board rendering impermissible advisory
> opinions based on hypothetical facts; and to protect the waters
> and the citizens of the state of Tennessee.

*Pickard I*, 2012 WL 3329618, at *2–3.

A final permit was issued to the Quarry on March 13, 2009. The terms of the final permit were substantially similar to the draft permit and likewise placed limits on the Total Suspended Solids and pH in waste water discharged by the Quarry. As we stated in *Pickard I*:

> The permit referenced the Tennessee Antidegradation Policy, as
> well as the stream survey conducted prior to the issuance of the
> draft permit, however, the permit rationale concluded that:

---

[4] Unavailable conditions exist where water quality is at, or fails to meet, the criterion for one or more parameters. In unavailable conditions, new or increased discharges of a substance that would cause or contribute to impairment will not be allowed. *See* Tenn. Comp. R. & Reg. 1200-4-3.06(2). In contrast, available conditions occur where water quality is better than the applicable criterion for a specified parameter. In available conditions, new or additional degradation for that parameter will only be allowed if the applicant has demonstrated to the department that reasonable alternatives to degradation are not feasible. *See* Tenn. Comp. R. & Reg. 1200-4-3.06(3).

Based on the survey results and review of all the data, neither the unnamed tributary nor the reach of Horse Creek near the proposed discharge qualifies as Exceptional Tennessee Waters. The data do not indicate the presence of Federal and/or State listed threatened or endangered species of aquatic life as occurring within a two-mile radius of the proposed discharge monitoring point.

In addition to the final permit and the rationale, TDEC issued a summary of the comments received during the public commenting period, including the comments set forth above regarding the Antidegradation rule. In response to those comments, TDEC stated:

There was significant public interest in classifying Horse Creek as Exceptional Tennessee Waters. Many comments were received from the public that specifically requested that status due to the public's enjoyment of the facilities at the Horse Creek Wildlife Sanctuary. However, antidegradation rules and field sampling protocols were followed, and the receiving streams (Horse Creek and its unnamed tributary) were not found to be Exceptional Tennessee Waters, pursuant to the Rules of the Tennessee Department of Environment and Conservation, Chapter 1200-4-3-.06(4)(a). Biological sampling followed semi-quantitative protocols specified in the [Standard Operating Procedures]. The sample reach was at a location of sufficient watershed size and stream order for comparison to ecoregion biocriteria.

*Pickard I*, 2012 WL 3329618, at \*3.

On April 6, 2009, the Appellees filed a "Permit Appeal and Declaratory Order Petition" with the Board challenging the decision to issue the final permit and requesting a contested case. As we stated in *Pickard I*:

The April 6, 2009 appeal recited essentially the same grounds as the former declaratory judgment action previously dismissed by the Board. The petition specifically requested that the Board find that TDEC improperly concluded that Horse Creek had available conditions. According to the Appellees, a proper application of the Antidegradation rule required a finding of unavailable conditions due to the impaired ratings in aquatic life and habitat. With a finding of unavailable conditions, the Appellees argue that the existing uses of the creek should be given higher protections.

*Pickard I*, 2012 WL 3329618, at *3.

On May 15, 2009, TDEC filed a motion to dismiss the declaratory order claim. The Appellees filed an amended Permit Appeal and Declaratory Order Petition on May 29, 2009. However, the Board granted the Appellants' motion to dismiss the declaratory order claim on October 6, 2009. The permit appeal remained pending before the Board.

### III. Proceedings in Chancery Court

On December 4, 2010, Appellees filed a petition for declaratory judgment pursuant to Tennessee Code Annotated Section 4-5-225 in the Chancery Court of Davidson County. The petition alleged that the Appellees had filed for a declaratory order with the Board on January 14, 2009, but that the Board had "declined to convene a contested case." The petition further alleged that the Appellees had filed another petition for declaratory relief with the Board concurrent with their appeal of the final permit issued by the Board, but that the Board had dismissed the declaratory relief claim. Accordingly, the Appellees argued that their administrative remedies under Tennessee Code Annotated Section 4-5-225 had been exhausted and that their remedy was to seek a declaratory judgment from Chancery Court.

The petition in Chancery Court specifically sought:

[A] declaratory [judgment] as to the validity and or applicability of the [] Board's Revised Anti-Degradation Rule, found at 1200-4-3-.06, the Criteria for Water Use, found at 1200-4-3-.03, and the Water Quality Control Act. [Appellees] contend[] that these rules and statutes, specifically §69-3-108(e) [now (g)] and §69-3-102, require more than a mere guess or supposition in finding that the discharge will not cause or contribute to a condition of pollution, and in concluding that degradation will not occur

-8-

because degradation is prohibited by the Rules. [Appellees] contend that the rule does not allow additional discharges to streams deemed to have unavailable conditions," and that characterizing the new discharges as de minimis in issuing a permit cannot comply with the rule when the permit contemplated and indeed, permits new discharges. [Appellees] contend[] that the interpretation and application of the Anti-Degradation rules as to mining activities does not comply with §69-3-108(g) when a receiving stream that is impaired, within the meaning of the Anti-Degradation Rule, will receive industrial wastewater discharges.

17. [Appellees] seek a declaratory [judgment] regarding whether [t]he Anti-Degradation Rule requires TDEC to assess the applicable parameters of water quality . . . , and to determine whether those parameters created "available conditions" or "unavailable conditions," as those terms are defined by the Anti-Degradation Rule. TDEC assessed the "biological integrity" and "habitat" parameters for Horse Creek following the protocols set forth in TDEC's [Standard Operating Procedures], as the water criteria rules require, and those assessments demonstrated that Horse Creek's biological condition was "slightly impaired" and its was "moderately impaired" with respect to the habitat assessment guidelines. According to the Anti-Degradation Rule, "unavailable conditions exist where water quality is at, or fails to meet, the criterion for one or more parameters." . . . [Appellees] contend[] that the rule is not valid because it lacks specificity and cannot be properly applied without a scientific basis or analysis for determining the type of conditions available in the stream and or whether measurable additional discharges would be 'de minimis' as defined in the Rules. [Appellees] contend that pursuant to Tenn. Code Ann. §4-5-223, an aggrieved party with a recognized interest in the area of the discharges has the right, under the state Water Quality Control Act, to a scientific application of the Anti-Degradations rules to reasonably ensure compliance with §69-3-108(g).

18. [Appellees] further contend as part of the [d]eclaratory [judgment] claim that TDEC's action in issuing the permit without the application of a scientific analysis and a reasoned finding of impacts measured against the existing stream conditions violated the [Appellees] rights and the State's

obligations under the Water Quality Control Act and promulgated water quality rules.

The Appellees further alleged that the Quarry had been modified since issuance of the permit and was no longer in compliance with the permit terms. Thus, the Appellees argued that "the issuance of the permit did not end the question of the applicable rules and their interpretation or application, and the on-going activities on the site evidence the need for clarification of the enforceable rights of the [Appellees]." Accordingly, the Appellees asked for a declaration that:

> 1) The purpose of the Water Quality Control Act is to abate existing pollution of the waters of Tennessee, reclaim polluted waters, to prevent future pollution of the waters, and to plan for the future use of the waters so that the water resources of Tennessee might be used and enjoyed to the fullest extent consistent with the maintenance of unpolluted waters;
> 2) The purpose of the Rules promulgated by the Water Board is to accomplish the purposes of the [Water Quality Control] Act;
> 3) Anti-Degradation Rule 1200-4-3-.06(2) does not allow new or increased discharges of a substance that would cause or contribute to a condition of impairment. With respect to all parameters of the Water Quality Control Criteria other than habitat, the term "de minimis" is not applicable in determining what would cause or contribute to a condition of impairment in the presence of unavailable conditions. With respect to all of those criteria other than habitat, there is no de minimis exception, and no discharges are permitted that would cause or contribute to a condition of pollution;
> 3) A determination of whether or not a discharge will "cause or contribute to a condition of impairment" requires, at a minimum, a scientifically sound, site-specific assessment of the receiving stream's capacity to assimilate the discharge;
> 4) Even if TDEC were correct that there is a "de minimis" exception for discharges into waters with unavailable conditions, the determination of a "de minimis" impact in streams deemed to have "unavailable conditions" would require,

at a minimum, a site-specific and scientifically-sound demonstration of how the proposed impact complies with the definition of "de minimis" found in the Water Quality Criteria Rules; and

> 5) TDEC failed to properly apply the Anti-Degradation Rule as

-10-

it relates to "unavailable conditions" when reviewing and
issuing the permit for [the Quarry].

Also on December 4, 2009, the Appellees filed a petition for judicial review of the
Board's refusal to consider its declaratory relief petition filed in conjunction with the permit
appeal, which is the subject of a prior case, *Pickard I*, No. M2011-01172-COA-R3-CV, 2012
WL 3329618 (Tenn. Ct. App. Aug. 14, 2012).

The Board filed an answer to the petition for declaratory judgment on February 1,
2010, asserting that the Chancery Court lacked jurisdiction to consider the petition because
the Appellees had failed to exhaust their administrative remedies and asking the Chancery
Court to decline to issue a declaratory order because the pending permit appeal was the
appropriate vehicle for resolution of the Appellees' concerns.

The Appellees moved for summary judgment on July 14, 2010, stating that a
determination of the issues in the motion would be dispositive of the case. The motion asked
for a determination regarding:

> 1) Whether Tennessee's Antidegradation regulations require a
> finding that "unavailable conditions" . . .  exist when water
> quality is at or fails to meet, the criteria for one or more
> parameters, which in this case was the failure to meet the criteria
> for two recognized parameters, Biological Integrity and Habitat.
> 2) When a finding is made of "unavailable conditions," whether
> the application of those Antidegradation regulations requires
> TDEC to utilize some scientifically sound process to determine
> if a proposed new discharge will "cause or contribute" to the
> existing documented condition(s) of impairment.

Appellees supported their motion with portions of various videotaped depositions, including
those of Ms. Fritz, the field biologist, and Gregory Denton, an employee of the TDEC.[5]

The Board filed a motion to dismiss on March 11, 2011, arguing that the trial court
lacked subject matter jurisdiction to consider the petition. The Chancellor entered an order
on April 11, 2011 concerning both the case on appeal and the declaratory relief action filed

---

[5] Only portions of Mr. Denton's deposition were included in the record on appeal. Although we
presume that Mr. Denton is an employee with the TDEC because he opines on the procedures taken by the
TDEC in this and like cases, no where in this seven volume record is there any indication as to the exact
position Mr. Denton holds with the TDEC.

in conjunction with the permit appeal. As we previously stated in ***Pickard I***:

The trial court ruled that:

> In sum, then the Court's construction of the interplay between [Tennessee Code Annotated Section] 69-3-105(i) [regarding a permit appeal] and [Tennessee Code Annotated Sections] 4-5-223 through 225 is that a petition for declaratory relief pursuant to section 4-5-223 related to the issuance of a permit may be requested by an aggrieved party in a permit appeal under section 69-3-105(i). This construction is based on: (1) the flexible and expansive text of section 69-3-105(i) that "any of the issues" raised during the permitting process "may" be presented in the appeal; (2) the need to assure that the right of an aggrieved party to obtain a ruling as a matter of law regarding the validity or application of a water quality statute or regulation is maintained for these reasons . . . , that declaratory relief has become such a hallmark in the law; and [(3)] the same standard of review and contested case procedure are used in the permit appeal and petition for declaratory order.

Accordingly, the trial court ruled that the Board erred in refusing to issue the requested declaratory order.

The trial court went on to note the "unusual procedural posture" in the case regarding the simultaneous filing of a petition for judicial review of the Board's refusal to issue a declaratory order and the separate petition for a declaratory judgment from the Chancery Court. Because the trial court perceived the issues to be identical in both the petition for judicial review and the petition for a declaratory judgment, the trial court ruled that its decision reversing the Board's refusal to issue a declaratory order in conjunction with the permit appeal rendered the separate petition for a declaratory judgment from the Chancery Court moot. Accordingly, the trial court dismissed

-12-

the separate petition for declaratory judgment and ordered that
the parties return to court for a hearing on whether the petition
for a declaratory order filed in conjunction with the permit
appeal would be remanded back to the Board for consideration.

*Pickard I*, at *5–6.

The Appellees filed a timely motion to alter or amend the trial court's ruling that the
case-at-bar was rendered moot by the trial court's decision in the judicial review case. The
Appellees argued that the two petitions sought different relief and, therefore, the petition for
a declaratory judgment was not rendered moot by the decision reversing the Board's refusal
to issue a declaratory order. On May 10, 2011, the trial court entered an order modifying its
previous order rendering this case moot, and ruled that this case could proceed.  The order
stated:

> In an April 11, 2011 Memorandum and Order, this Court
> concluded that the above captioned lawsuit was moot and
> dismissed it. After considering the [Appellees'] motion to alter
> or amend, the Court . . . concludes that it erred. This case is not
> moot. Instead, the Court has subject matter jurisdiction of this
> case and it is ripe pursuant to Tennessee Code Annotated
> Sections 4-5-223(a)(2) and 225.
>
> The error this Court made is that it concluded that the
> disposition by the Board below of [Appellees'] claim for a
> declaratory order from the Board under the Uniform
> Administrative Procedures Act ("UAPA") was a dismissal of the
> case (on the grounds that the claim was premature). That
> conclusion of the Court was incorrect. Instead, the Board
> refused to determine the matter, as seen from a review of the
> Board's order. The order states that its disposition is "pursuant
> to Tennessee Code Annotated Section 4-5-223(a)(2)." That is
> the section of the UAPA that provides, "The agency shall . . .
> [r]efuse to issue a declaratory order, in which event the person
> petitioning the agency for a declaratory order may apply for a
> declaratory judgment as provided in §4-5-225." Reference to
> section 4-5-225 reveals that jurisdiction is vesting in this Court
> to determine the matter upon refusal by the agency. This case is
> not moot. It is pending independently before this Court pursuant
> to Sections 4-5-223(a)(2) and 225 upon the Board's refusal to
> take up the matter.

It is therefore ORDERED that the Court alters and amends its April 11, 2011 ruling and provides herein: this case is not dismissed for mootness, and it is reinstated to proceed as a petition for a declaratory judgment pursuant to section 4-5-225. In all other respects the April 11, 2011 Memorandum and Orders remains the ruling of the Court.

* * *

It is additionally ORDERED that the next step in this case is to finish the briefing and conduct a hearing on petitioner's motion for summary judgment. . . .

The Board filed a motion for an interlocutory appeal on June 9, 2011. The trial court denied the motion by order of July 5, 2011. TDEC filed an answer to the petition for declaratory judgment on July 8, 2011, asserting essentially the same defenses as the Board.

The Appellees filed another motion for summary judgment on August 3, 2011, again stating that resolution of the issues in the motion would be dispositive of the case. The Appellees specifically sought a declaration that:

1.    [Appellees] have "standing," a legally recognizable interest in Horse Creek that they seek to protect and for which this case presents a justiciable controversy;
2.    Tennessee's Antidegradation regulations require a finding that "unavailable conditions," . . . . exist when water quality is at or fails to meet the criteria for one or more parameters, which in this case was the failure of Horse Creek to meet the criteria for the two recognized parameters of Biological Integrity and Habitat; and
3.    When unavailable conditions exist, the Antidegradation rules require a scientifically-sound process to determine if a proposed new discharge will "cause or contribute" to the existing, documented conditions of impairment. Insofar as the rule does not require such a process, it is invalid and violates the Tennessee Water Quality Control Act. Insofar as TDEC applies the rules without using such a process, the application violated the rule and the Act.

The trial court heard the motion for summary judgment on September 9, 2011. The

Board and TDEC first argued that the Appellees did not have standing to contest the issuance of the permit and that the case was not ripe for review. In addition, the Board and TDEC relied on Mr. Denton's deposition testimony to argue: 1) Biological Integrity and Habitat are not parameters within the meaning of the Antidegradation rule; and 2) even if the court finds that Biological Integrity and Habitat are parameters, a finding that Horse Creek is impaired as to those parameters does not necessitate a finding that the creek is impaired as to pH and Total Suspended Solids, the only type of pollutants sought to be discharged by the Quarry. In contrast, the Appellees argued that the plain language of the Antidegradation rule required a finding that both Biological Integrity and Habitat are parameters for the type of water at issue and that a finding of impairment for any parameter requires a finding that water is unavailable, triggering increased protections.

The trial court entered an order on October 17, 2011, containing detailed findings of fact and conclusions of law. The trial court first concluded that the Appellees had standing to seek the declaratory order.[6] The trial court next ruled that the case was ripe for review and that the Appellees had exhausted all administrative remedies. The Court then concluded, based on its earlier reasoning in the April 11, 2011 order, that the Appellees could bring a declaratory order petition notwithstanding Tennessee Code Annotated Section 69-3-105(i) regarding the permit appeal, discussed in more detail below. Finally, the Court agreed with the Appellees' substantive arguments regarding the interpretation given to the Antidegradation rule and ruled that both Biological Integrity and Habitat were indeed parameters, and that the impairment of these parameters required a finding that Horse Creek has "unavailable conditions." The trial court then dismissed, as a matter of law, the Appellees' final claim that the "unavailable conditions" rule is facially invalid in failing to require a scientifically-sound method of determining whether a finding of "unavailable conditions" will cause or contribute to a condition of impairment. The trial court found that this argument had not been presented to the Board previously and that the rule was not vague. Appellees do not appeal this ruling. Having disposed of all the issues in the Appellee's motion for summary judgment and declaratory judgment petition, the trial court found that the judgment was final. The Appellants filed separate notices of appeal on November 16, 2011.

### IV. Issues Presented

The Appellants raise the following issues for review, which are taken from their briefs:

> 1. Did the trial court err in effectively reversing the

---

[6] This ruling is not challenged on appeal.

-15-

[Board's] ruling that a tentative determination by the [TDEC] on a water quality permit application that "available conditions" exist . . . was not ripe for review and in thereby concluding it had jurisdiction to entertain [Appellees'] declaratory judgment action?

2. Except as expressly provided therein, does Tennessee Code Annotated Section 69-3-105(i) preclude filing for a declaratory order . . . once a water quality permit application has been submitted to TDEC?

Additionally, TDEC raises the following issue, taken from its brief:

1. Did the trial court err in construing Rule 1200-04-04-.06 to require finding that there were "unavailable conditions" . . . for the proposed discharge in the draft permit?

## V. Standard of Review

A trial court's decision to grant a motion for summary judgment presents a question of law. Our review is therefore *de novo* with no presumption of correctness afforded to the trial court's determination. ***Bain v. Wells***, 936 S.W.2d 618, 622 (Tenn. 1997). "This Court must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied." ***Mathews Partners, L.L.C. v. Lemme***, No. M2008–01036–COA–R3–CV, 2009 WL 3172134, at *3 (citing ***Hunter v. Brown***, 955 S.W.2d 49, 50–51 (Tenn. 1977)).

When a motion for summary judgment is made, the moving party has the burden of showing that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04. The moving party may accomplish this by either: (1) affirmatively negating an essential element of the non-moving party's claim; or (2) showing that the non-moving party will not be able to prove an essential element at trial. ***Hannan v. Alltel Publ'g Co.***, 270 S.W.3d 1, 8–9 (Tenn. 2008). However, "[i]t is not enough for the moving party to challenge the nonmoving party to 'put up or shut up' or even to cast doubt on a party's ability to prove an element at trial." ***Id***. at 8. If the moving party's motion is properly supported, "[t]he burden of production then shifts to the nonmoving party to show that a genuine issue of material fact exists." ***Id***. at 5 (citing ***Byrd v. Hall***, 847 S.W.2d 208, 215 (Tenn. 1993)). The non-moving party may accomplish this by: "(1) pointing to evidence establishing material factual disputes that were overlooked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party;

(3) producing additional evidence establishing the existence of a genuine issue for the trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P. 56.06." *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008) (citations omitted).

When reviewing the evidence, we must determine whether factual disputes exist. In evaluating the trial court's decision, we review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003). If we find a disputed fact, we must "determine whether the fact is material to the claim or defense upon which summary judgment is predicated and whether the disputed fact creates a genuine issue for trial." *Mathews Partners*, 2009 WL 3172134, at *3 (citing *Byrd*, 847 S .W.2d at 214). "A disputed fact is material if it must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Byrd*, 847 S.W.2d at 215. A genuine issue exists if "a reasonable jury could legitimately resolve the fact in favor of one side or the other." *Id*. "Summary [j]udgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion." *Landry v. South Cumberland Amoco, et al.*, No. E2009–01354–COA–R3–CV, 2010 WL 845390, at *3 (Tenn. Ct. App. March 10, 2010) (citing *Carvell v. Bottoms*, 900 S.W.2d 23 (Tenn. 1995)). However, if there is any uncertainty concerning a material fact, then summary judgment is not the appropriate disposition. As stated by our Supreme Court in *Evco Corp. v. Ross*, 528 S.W.2d 20 (Tenn. 1975):

> The summary judgment procedure was designed to provide a quick, inexpensive means of concluding cases, in whole or in part, upon issues as to which there is no dispute regarding the material facts. Where there does exist a dispute as to facts which are deemed material by the trial court, however, or where there is uncertainty as to whether there may be such a dispute, the duty of the trial court is clear. He [or she] is to overrule any motion for summary judgment in such cases, because summary judgment proceedings are not in any sense to be viewed as a substitute for a trial of disputed factual issues.

*Id*. at 24–25.

## VI. Analysis

### A. Justiciability

We turn first to Appellants' procedural arguments. As we perceive it, Appellants argue that this petition for declaratory judgment is barred by the closely related doctrines of ripeness and exhaustion of administrative remedies because the January 2009 petition for a declaratory order was filed prior to issuance of a final permit.

The Tennessee Supreme Court recently applied the justiciability doctrines to a claim for declaratory relief. In explaining the application of the doctrines, the Court stated:

> Although a plaintiff in a declaratory judgment action need not show a present injury, an actual "case" or "controversy" is still required. *Cardinal Chem. Co. v. Morton Int'l*, 508 U.S. 83, 95, 113 S. Ct. 1967, 124 L. Ed.2d 1 (1993) (stating that "a party seeking a declaratory judgment has the burden of establishing the existence of an actual case or controversy"). A bona fide disagreement must exist; that is, some real interest must be in dispute. *Goetz v. Smith*, 152 Tenn. 451, 278 S.W. 417, 418 (1925). Courts still may not render advisory opinions based on hypothetical facts. *Third Nat'l Bank v. Carver*, 31 Tenn. App. 520, 218 S.W.2d 66, 69 (1948). The justiciability doctrines of standing, ripeness, mootness, and political question continue as viable defenses. *See, e.g., Texas v. United States*, 523 U.S. 296, 118 S. Ct. 1257, 140 L.Ed.2d 406 (1998) (finding a declaratory judgment action was not ripe); *Cardinal Chem.*, 508 U.S. at 83, 113 S. Ct. 1967 (finding a declaratory judgment action was moot). Moreover, in disputes involving a state agency, one must generally exhaust the available administrative remedies before filing a suit for declaratory relief. *See Abington Ctr. Assocs. Ltd. P'ship v. Baltimore County*, 115 Md. App. 580, 694 A.2d 165, 170 (1997); *see also* Tenn. Code Ann. § 4-5-225 (2005 & Supp. 2007). Subject to some exceptions, a declaratory judgment action should not be considered where special statutory proceedings provide an adequate remedy. *Katzenbach v. McClung*, 379 U.S. 294, 296, 85 S. Ct. 377, 13 L.Ed.2d 290 (1964). This includes administrative remedies prescribed under the Uniform Administrative Procedures Act ("UAPA") and other relevant sections of the Tennessee Code.

*Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 837–38 (Tenn. 2008) (footnote omitted).

In this appeal, the Appellants argue that the Appellees' claim for declaratory relief is not ripe because, at the time the Board declined to consider the Appellees' January 2009 petition for a declaratory order, no final permit had been issued by TDEC. The Appellants further point to the Board's dismissal of the January 2009 petition, which states that the Board declines to convene a contested case "at this time" due to issues of ripeness, to argue that the Appellees have failed to exhaust their administrative remedies to first seek a declaratory order from the Board.

The Tennessee Supreme Court also recently discussed the doctrine of ripeness:

> Doctrines such as ripeness assist the courts in determining whether a particular case presents a justiciable legal issue. ***Norma Faye Pyles Lynch Family Purpose LLC v. Putnam Cnty.***, 301 S.W.3d 196, 203 (Tenn. 2009). The ripeness doctrine focuses on whether the dispute has matured to the point that it warrants a judicial decision. The central concern of the ripeness doctrine is whether the case involves uncertain or contingent future events that may or may not occur as anticipated or, indeed, may not occur at all. *See **Lewis v. Cont'l Bank Corp.***, 494 U.S. 472, 479–80, 110 S. Ct. 1249, 108 L. Ed.2d 400 (1990). . . .

> Determining whether a particular dispute is ripe entails a two-part inquiry. The first question is whether the issues in the case are ones appropriate for judicial resolution. The second question is whether the court's refusal to act will cause hardship to the parties . . . . The court will decline to act "where there is no need for the court to act or where the refusal to act will not prevent the parties from raising the issue at a more appropriate time." ***AmSouth Erectors, LLC v. Skaggs Iron Works, Inc.***, No. W2002–01944–COA–R3–CV, 2003 WL 21878540, at *6 (Tenn. Ct. App. Aug.5, 2003) (No Tenn. R. App. P. 11 application filed) (quoting ***Window Gallery of Knoxville v. Davis***, No. 03A01–9906–CH–00225, 1999 WL 1068730, at *3 (Tenn. Ct. App. Nov.24, 1999) (No Tenn. R. App. P. application filed) (emphasis omitted).

***B & B Enters. of Wilson Cnty., LLC v. City of Lebanon***, 318 S.W.3d 839, 848–49 (Tenn. 2010); *see also **Texas v. United States***, 523 U.S. 296, 300, 118 S. Ct. 1257, 140 L. Ed.2d 406

(1998) ("A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'") (quoting ***Thomas v. Union Carbide Agric. Prods. Co.***, 473 U.S. 568, 580–81, 105 S. Ct. 3325, 87 L. Ed.2d 409 (1985)).

The Tennessee Supreme Court has also held that the doctrine of ripeness "is closely related to the 'exhaustion of administrative remedies' doctrine.'" ***B & B***, 318 S.W.3d at 848 (citing 13B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3532.1.1 (3d ed.2008)); *see also* ***Colonial Pipeline***, 263 S.W.3d 837–38 ("Ripeness and exhaustion are complementary doctrines which are designed to prevent unnecessary or untimely judicial interference in the administrative process. ") (quoting ***Ticor Title Ins. Co. v. FTC***, 814 F.2d 731, 735 (D.C. Cir. 1987)). According to our Supreme Court:

> Th[e] doctrine [of exhaustion of remedies], which prompts courts to stay their hand until an administrative proceeding is completed, ***Bailey v. Blount Cnty. Bd. of Educ.***, 303 S.W.3d 216, 235 (Tenn. 2010), reflects the courts' acknowledgment that administrative agencies have special expertise with regard to the subject matter of the proceedings before them. ***Colonial Pipeline Co. v. Morgan***, 263 S.W.3d 827, 839 (Tenn. 2008); ***Southern Ry. v. State Bd. of Equalization***, 682 S.W.2d 196, 199 (Tenn. 1984); ***Martin v. Sizemore***, 78 S.W.3d 249, 269 (Tenn. Ct. App. 2001). Accordingly, in most circumstances, the courts deem it appropriate to permit administrative agencies to develop their final position with regard to the matters before them prior to undertaking to review the agency's decision. By doing so, the courts not only demonstrate their respect for the administrative process, they also assure the existence of a complete administrative record should judicial review of the agency's decision be sought. ***Colonial Pipeline Co. v. Morgan***, 263 S.W.3d at 838–39.

***B & B***, 318 S.W.3d at 847–48. The Supreme Court further explained the purpose of this doctrine in ***Colonial Pipeline Co. v. Morgan***, 263 S.W.3d 827 (Tenn. 2008), stating:

> Both courts and legislatures have recognized that the exhaustion doctrine promotes judicial efficiency and protects administrative authority in at least three ways. First, sometimes "[j]udicial intervention may not be necessary because the agency can correct any initial errors at subsequent stages of the process[,

and] the agency's position on important issues of fact and law may not be fully crystallized or adopted in final form." *Ticor Title*, 814 F.2d at 735[]. Secondly, exhaustion allows the agency to develop a more complete administrative record upon which the court can make its review. *Efco Tool Co. v. Comm'r*, 81 T.C. 976, 981, 1983 WL 14906 (1983). Finally, cases that concern subject matter within the purview of administrative agencies often involve "specialized fact-finding, interpretation of disputed technical subject matter, and resolving disputes concerning the meaning of the agency's regulations." *West v. Bergland*, 611 F.2d 710, 715 (8th Cir. 1979) (citations omitted). Requiring that administrative remedies be exhausted often leaves courts better equipped to resolve difficult legal issues by allowing an agency to "'perform functions within its special competence.'" *Id.* (quoting *Parisi v. Davidson*, 405 U.S. 34, 37, 92 S. Ct. 815, 31 L. Ed.2d 17 (1972)).

While the doctrine arose as a discretionary rule in courts of equity, today many exhaustion requirements are mandated by legislation. *See Smith v. United States*, 199 F.2d 377, 381 (1st Cir. 1952). When a statute provides specific administrative procedures, "one claiming to have been injured must first comply with the provisions of the administrative statute." *State v. Yoakum*, 201 Tenn. 180, 297 S.W.2d 635, 641 (1956) (citing *State ex rel. Jones v. City of Nashville*, 198 Tenn. 280, 279 S.W.2d 267 (1955)). The mere fact that an agency probably will deny relief is not a sufficient excuse for failure to exhaust available remedies. *Id.* Exhaustion of administrative remedies is not an absolute prerequisite for relief, however, unless a statute "by its plain words" requires exhaustion. *Thomas v. State Bd. of Equalization*, 940 S.W.2d 563, 566 (Tenn. 1997) (quoting *Reeves v. Olsen*, 691 S.W.2d 527, 530 (Tenn. 1985)). Thus, a statute does not require exhaustion when the language providing for an appeal to an administrative agency is worded permissively. *Id.* Absent any statutory mandate, whether to dismiss a case for failure to exhaust administrative remedies would be a matter of "sound judicial discretion." *Reeves*, 691 S.W.2d at 530 (quoting *Cerro Metal Prod. v. Marshall*, 620 F.2d 964, 970 (3d Cir.1980)).

*Id.* at 838–39.

Tennessee Code Annotated Section 4-5-225(b) indeed requires that the complainant exhaust all administrative remedies before petitioning the Chancery Court for a declaratory judgment: "A declaratory judgment shall not be rendered concerning the validity or applicability of a statute, rule or order unless the complainant has petitioned the agency for a declaratory order and the agency has refused to issue a declaratory order." Based on the foregoing, for the Chancery Court to consider the merits of Appellees' declaratory judgment petition, the Appellees' petition for a declaratory judgment must be ripe and the Appellees must have exhausted all administrative remedies. The Appellants argue that the January 2009 petition for a declaratory order was premature because, at that time, issuance of the final permit was merely a "contingent future event that may not occur as anticipated." *Union Carbide*, 473 U.S. at 580–81. The Appellants further argue that, having never presented the Board with a ripe petition for a declaratory order, the Appellees have failed to exhaust the requirement to first seek an order from the Board.

In making their argument, however, the Appellants misconstrue the procedural history of this case, as well as the procedures for gaining declaratory relief as dictated by the UAPA. It is true that Appellees first filed a petition for a declaratory order from the Board in January 2009, which was prior to issuance of a final permit. In declining to convene a contested case, the Board stated that it was refusing to grant the requested relief "at this time based on the stipulated fact that the permit at issue has not been issued [and] to prevent against the Board rendering impermissible advisory opinions based on hypothetical facts." While the Board may have been correct that the issue was not ripe for review at that time,[7] the Chancery Court in this case was faced with an entirely different set of facts. At the time the Appellees filed their petition for a declaratory judgment, pursuant to Tennessee Code Annotated Section 4-5-225, in the Davidson County Chancery Court, a final permit had been issued to the Quarry. This final permit, like the draft permit, did not conclude that Horse Creek had "unavailable conditions." Accordingly, Appellant's contention that the case is not ripe because there had been no final permit issued is meritless.

Applying the two-part ripeness inquiry to the facts of this case, we conclude that the issues presented in this case are ripe for review. First, there is no dispute that the issues presented in this case are appropriate for judicial review. *B & B*, 318 S.W.3d at 848. Issues of statutory interpretation have long been the province of the judiciary. *See State v. Union Bank*, 17 Tenn. 119, 1836 WL 1120, at *6 (Tenn. 1836) (noting that courts have the power to interpret ambiguous statutes). We turn next to the question of whether "there is no need

---

[7] We take no position as to whether the January 2009 petition for a declaratory order, alone, was indeed a ripe controversy.

for the court to act or where the refusal to act will not prevent the parties from raising the issue at a more appropriate time." *Id.* (quoting *AmSouth Erectors*, 2003 WL 21878540, at *6). The Appellees argue that the issues in this case are ripe, citing *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827 (Tenn. 2008). In *Colonial Pipeline*, the Supreme Court stated:

> "Declaratory judgments" are so named because they proclaim the rights of the litigants without ordering execution or performance. 26 C.J.S. *Declaratory Judgments* § 1 (2001). Their purpose is to settle important questions of law before the controversy has reached a more critical stage. 26 C.J.S. *Declaratory Judgments* § 3 (2001). The chief function is one of construction. *Hinchman v. City Water Co.*, 179 Tenn. 545, 167 S.W.2d 986, 992 (1943) (quoting *Newsum v. Interstate Realty Co.*, 152 Tenn. 302, 278 S.W. 56, 56–57 (1925)). While findings of fact are permitted in a declaratory judgment action, "the settlement of disputed facts at issue between the parties will ordinarily be relegated to the proper jurisdictional forums otherwise provided." *Id.*

*Colonial Pipeline*, 263 S.W.3d at 837. Further, the Supreme Court stated that "declaratory judgment actions have gained popularity as a proactive means of preventing injury to the legal interests and rights of a litigant." *Id.* at 836. In addition, the Court cited with approval the opinion of one commentator, who "observed that the declaratory judgment action recognizes that '[c]ourts should operate as preventive clinics as well as hospitals for the injured.'" *Id.* (quoting Henry R. Gibson, Gibson's Suits in Chancery, § 545 (6th ed. 1982)). Thus, the Appellees argue that the petition for declaratory relief, by its very nature, allows a determination of rights at the point when "some real interest [is] in dispute." *Colonial Pipeline*, 263 S.W.3d at 837 (citing *Goetz*, 278 S.W. at 418).

At this time, a final permit has been issued that did not find "unavailable conditions" in Horse Creek and its unnamed tributary despite the impairments regarding Biological Integrity and Habitat. Thus, the issuance of a permit without a finding of "unavailable conditions" is not "hypothetical," *Colonial Pipeline*, 263 S.W.3d at 837, or "uncertain or contingent." *B & B*, 318 S.W.3d at 847. A final permit having been issued, there is not a more "critical stage" at which this issue can be adjudicated.[8] *Colonial Pipeline*, 263 S.W.3d

---

[8] We note that the Appellants apparently made an additional ripeness argument in the trial court. Specifically, the Appellants argued that the case was not ripe because the permit appeal had not been completed. However, this argument was not presented in the Appellants' briefs. Accordingly, it is waived.

(continued...)

at 837 (citing 26 C.J.S. *Declaratory Judgments* § 3 (2001)). Accordingly, interpretation of the rules and regulations regarding the state's Antidegradation policy is appropriate at this time.

Appellants' contention that the Appellees have failed to exhaust their administrative remedies is likewise without merit. As noted in Appellees' petition for declaratory judgment, the Appellees' first sought a declaratory order prior to issuance of a final permit and the Board dismissed the petition for a lack of ripeness. Thus, Appellants contend that the Board's dismissal of the action was not an exercise of discretion pursuant to Tennessee Code Annotated Section 4-5-223, from which the Appellees were entitled to seek judicial intervention pursuant to Tennessee Code Annotated Section 4-5-225.

As previously discussed by this Court in *Pickard I*, M2011-01172-COA-R3-CV, 2012 WL 3329618, (Aug. 14, 2012):

> Petitions for declaratory orders before administrative agencies
> such as the Board in this case are governed by Tennessee Code

---

[8](...continued)
*See* Tenn. R. App. P. 13(b) ("Review will generally only extend to those issues presented for review."); ***Bean v. Bean***, 40 S.W.3d 52, 55–56 (Tenn. Ct. App. 2000). Although we note that federal courts have held that questions of ripeness concern subject matter jurisdiction and, therefore, cannot be waived, ***Bigelow v. Mich. Dep't of Natural Res.***, 970 F.2d 154, 157 (6th Cir.1992), our Supreme Court has stated that when a matter is not ripe for review, it will "decline" to consider the case; our Supreme Court has not held that a court lacks subject matter jurisdiction when the case is not ripe for review. *See* ***City of Memphis v. Shelby County Election Com'n***, 146 S.W.3d 531, 538 (Tenn. 2004); *but see* ***Admiralty Suites and Inns, LLC v. Shelby County***, 138 S.W.3d 233 (Tenn. Ct. App. 2003) (framing the issue of ripeness as one of subject matter jurisdiction). Even if we were to consider the Appellants' argument in the trial court that the case is not ripe because the permit appeal remains pending, we must agree with the trial court that:

> Under these circumstances, the argument that the Court should defer to the administrative process by not proceeding with declaratory relief, and thereby allow the permit appeal to run its course where the issues may be straightened out, is not compelling,. The [Appellants'] position requires all parties to wait until the permitting appeal, with its contested case hearing, is complete for [Appellants] to be able to present, on an appeal of the permit appeal, their dispositive issue of law. If the [Appellants] prevail, the permit proceedings will have been a waste, and must be remanded and started again to gather new facts and data under the correct legal standard.
> The Court therefore concludes that because the claim is one for declaratory relief and given the unusual facts of this case, there is a ripe, justiciable controversy.

-24-

Annotated Section 4-5-223:

> (a) Any affected person may petition an agency for a declaratory order as to the validity or applicability of a statute, rule or order within the primary jurisdiction of the agency. The agency shall:
>
> (1) Convene a contested case hearing pursuant to this chapter and issue a declaratory order, which shall be subject to review in the chancery court of Davidson County, unless otherwise specifically provided by statute, in the manner provided for the review of decisions in contested cases; or
>
> (2) Refuse to issue a declaratory order, in which event the person petitioning the agency for a declaratory order may apply for a declaratory judgment as provided in § 4-5-225.
>
> * * *
>
> (c) If an agency has not set a petition for a declaratory order for a contested case hearing within sixty (60) days after receipt of the petition, the agency shall be deemed to have denied the petition and to have refused to issue a declaratory order.

*Pickard I*, 2012 WL 3329618, at *7. The Chancery Court only has jurisdiction to consider a declaratory judgment petition once the Board has declined to issue an order and convene a contested case. *See* Tenn. Code Ann. §4-5-225(b). As explained by our Supreme Court in *Hughley v. State*, 208 S.W.3d 388 (Tenn. 2006): "[T]he provisions of section 4-5-225, setting forth the procedure for seeking a judicial determination of the claims made in a petition for declaratory order [apply] after the agency refuses under section 4-5-223(a)(2) to issue the requested order." *Id.* at 393. Accordingly, the Board must exercise its discretion to decline to convene a contested case and refuse to issue a declaratory order before the Chancery Court can gain jurisdiction to consider the petition for declaratory judgment.

The Appellants argue that the Board did not decline to convene a contested case when it dismissed the January 2009 petition for lack of ripeness. However, again the Appellants

misconstrue the history of this case and the relevant procedures regarding declaratory judgment actions pursuant to the UAPA. Not only did the Appellees file a petition for a declaratory order in January 2009, which was prior to issuance of the final permit in this case, but, as noted in their petition for declaratory judgment in the Chancery Court, the Appellees also filed a petition for a declaratory order with the Board concurrent with their permit appeal, after TDEC issued a final permit. The Board also dismissed this petition on procedural grounds. The Appellees subsequently filed an appeal to the Chancery Court of Davidson County, seeking judicial review of the Board's decision pursuant to Tennessee Code Annotated Section 4-5-322(a). *See Pickard I*, 2012 WL 3329618, at *5. This Court dismissed the appeal in *Pickard I*, however, and held that the judicial review statute was not the appropriate avenue to seek judicial intervention after the Board refuses to issue a declaratory order. Instead, we held:

> Tennessee Code Annotated Section 4-5-223 clearly provides that the appropriate procedure to follow when the Board refuses to issue a declaratory order is to seek a declaratory judgment pursuant to Tennessee Code Annotated Section 4-5-225. This statute provides:
>
> > (a) The legal validity or applicability of a statute, rule or order of an agency to specified circumstances may be determined in a suit for a declaratory judgment in the chancery court of Davidson County, unless otherwise specifically provided by statute, if the court finds that the statute, rule or order, or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the complainant. The agency shall be made a party to the suit.
> > (b) A declaratory judgment shall not be rendered concerning the validity or applicability of a statute, rule or order unless the complainant has petitioned the agency for a declaratory order and the agency has refused to issue a declaratory order.
>
> Tenn. Code Ann. § 4-5-225. . . . Consequently, when an agency refuses to issue a declaratory order, proper procedure dictates that the complaining party follow the specific procedures of

-26-

Tennessee Code Annotated Sections 4-5-223 and -225 and file
a petition for a declaratory judgment in Chancery Court rather
than the more general Tennessee Code Annotated Section 4-5-
322 procedures regarding a petition for judicial review.

*See Pickard I*, 2012 WL 3329618, at *8–9. That is exactly what the Appellees have done
in this case. After the denial of both the pre-permit and post-permit declaratory order
petitions, the Appellees properly filed a petition pursuant to Tennessee Code Annotated
Section 4-5-225 in the Davidson County Chancery Court, stating that all administrative
remedies had been exhausted because the Board had twice refused to issue a declaratory
order.

We have previously held that the Board's refusal to issue a declaratory order in
*Pickard I* was an exercise of discretion sufficient to trigger the Appellees' rights to seek a
declaratory judgment in Chancery Court pursuant to Tennessee Code Annotated Section 4-5-
225. As this Court explained:

> "[T]he decision of whether to issue a declaratory order is within
> an agency's discretion." *Consumer Advocate Div. ex rel.
> Tennessee Consumers v. Tennessee*, No.
> M1999-01170-COA-R12-CV, 2001 WL 575570, *5 (Tenn. Ct.
> App. May 30, 2001). . . .
>
> *       *       *
>
> In the context of the Appellees' petition for a declaratory order,
> Tennessee Code Annotated Section 4-5-223 specifies what
> action the Board, in its discretion, may take. Here, the Board had
> three options: 1) convene a contested case in order to decide the
> merits of the petition for declaratory order; 2) refuse to issue a
> declaratory order, in which case the complaining party may file
> a petition for a declaratory judgment pursuant to Tennessee
> Code Annotated Section 4-5-225; or 3) take no action, in which
> case, the petition for declaratory judgment is deemed denied and
> the complainant may file a petition for a declaratory judgment
> pursuant to Tennessee Code Annotated Section 4-5-225. *See*
> Tenn. Code Ann. §4-5-223; *see also* **Hughley v. State**, 208
> S.W.3d 388 (Tenn. 2006) (holding that when petitioned for a
> declaratory order, the agency "may respond in one of two ways:
> (1) convene a contested case hearing and issue a declaratory

order or (2) refuse to issue a declaratory order" either by a formal denial or by taking no action). Although the order denying the Appellees' petition for a declaratory order is styled as an order granting a motion to dismiss, of the only three options available to the Board pursuant to Tennessee Code Annotated Section 4-5-223, the Board clearly refused to issue the requested declaratory order. *See* ***Gordon v. Greenview Hosp. Inc.***, 300 S.W.3d 635, 643 (Tenn. 2009) (citing ***Tenn. Farmers Mut. Ins. Co., v. Farmer***, 970 S.W.2d 453, 455 (Tenn. 1998) (noting that with regard to legal filings, the law favors substance over style)).

***Pickard I***, 2012 WL 3329618, at *7–8. Thus, the Appellees sought, and were denied, relief by the Board. Indeed, the Board in ***Pickard I*** refused to issue the petition based on its interpretation of Tennessee Code Annotated Section 69-3-105(i), which the Board held foreclosed declaratory relief once a final permit had been issued. Accordingly, we must conclude that the Board has "develop[ed] [its] final position with regard to the matters before [it]." ***B & B***, 318 S.W.3d at 848. As such, we must conclude that Appellees have exhausted their administrative remedies in this case.

### B. Tennessee Code Annotated Section 69-3-105(i)

The Appellants next argue that declaratory relief is not appropriate in this case because a petition for a declaratory order regarding a pre-permit decision is only allowed in certain, inapplicable, situations, as limited by statute.

The Appellants rely on Tennessee Code Annotated Section 69-3-105(i), which states, in pertinent part:

> Upon receiving a petition for permit appeal, the board has the power, duty, and responsibility to hold a contested case hearing concerning the commissioner's issuance or denial of a permit. During this hearing, the board shall review the commissioner's permit decision and may reverse or modify the decision upon finding that it does not comply with any provisions of this part. . . . Notwithstanding the provisions of §§ 4-5-223 or 69-3-118(a), or any other provision of law to the contrary, this subsection (i) and the established procedures of Tennessee's antidegradation statement, found in the rules promulgated by the department, shall be the exclusive means for obtaining

administrative review of the commissioner's issuance or denial
of a permit.

According to Appellants' argument, the above statute allows a pre-permit declaratory order petition in only one situation, which Appellants argue is set out in "the established procedures of Tennessee's antidegradation statement, found in the rules promulgated by the department." As stated by the Board in its brief:

> The reference to 'the established procedures of Tennessee's antidegradation statement' speaks to the singular instance in which administrative review may occur pursuant to §4-5-223. That instance arises when TDEC determines during the permitting process that degradation of certain waters, identified as Exceptional Tennessee Waters, is justified. See Tenn. Comp. R. & Reg. 1200-04-03-.06(4)(d)(1).[9] It is inapplicable in this case because the proposed receiving waters were not determined to be Exceptional Tennessee Waters.

Thus, the Appellants argue that Tennessee Code Annotated Section 69-3-105(i) precludes review of decisions related to the issuance of a draft permit except under the limited circumstances explained above. However, as we have previously pointed out, the petition for a declaratory judgment in the Davidson County Chancery Court cites not only the Board's refusal to grant the declaratory order sought prior to issuance of the final permit, but also the Board's refusal to consider the declaratory order petition filed after issuance of the final permit. Thus, Appellant's argument that the Appellees may not seek a declaratory judgment in the Chancery Court regarding the draft permit due to Tennessee Code Annotated Section 69-3-105(i)'s specific language regarding the established procedures of Tennessee's Antidegradation statement fails.

---

[9] Tennessee Compiled Rule and Regulation 1200-04-03-.06(4)(d)(1) states, in pertinent part:

> If the Department determines that degradation [of Exceptional Tennessee Waters] is justified, it will notify the applicant, the federal and state intergovernmental coordination agencies, and third persons who requested notification of the determination. Within 30 days after the date of the notification, any affected intergovernmental coordination agency or affected third person may petition the Board for a declaratory order under Tennessee Code Annotated § 4-5-223, and the Board shall convene a contested case.

We note that, in ***Pickard I***, the Appellants argued that Appellees were not entitled to bring a petition for declaratory relief in conjunction with their permit appeal after a final permit had been issued, pursuant to the above statute's express statement that "[n]otwithstanding the provisions of § 4-5-223 . . . , this subsection(i) . . . shall be the exclusive means for obtaining administrative review of the commissioner's issuance or denial of a permit." *See **Pickard I***, 2012 WL 3329618, at *6. However, this argument was not presented in either the Board's or TDEC's brief in this case. While this Court did grant the Appellant's motion to consolidate this case for purposes of oral argument only, no request to consolidate the cases for purposes of a final disposition has been requested or granted. Therefore, arguments presented solely in the briefs of ***Pickard I*** will not be considered in this case. In addition, it is well-settled that an issue the Appellant does not raise or adequately argue in its appellate brief is considered waived in this Court.[10] ***Thompson v. Deutsche Bank Nat. Trust Co.***, No. W2011–00329–COA–R3–CV, 2012 WL 1980373, *3 (Tenn. Ct. App. June 4, 2012) (citing Tenn. R. App. P. 27(a)(7); Tenn. Ct. App. R. 6(a), (b); ***Bean v. Bean***, 40 S.W.3d 52, 55–56 (Tenn. Ct. App. 2000)). Accordingly, we decline to consider this argument. The judgment of the trial court with regard to this issue is, therefore, affirmed.

## C. Interpretation of Antidegradation Rule

Finally, TDEC argues that the trial court erred in construing the Antidegradation rule to require a finding that there were "unavailable conditions" in the permit at issue in this case. Specifically, TDEC argues that the trial court erred in concluding that the impairments with regard to Biological Integrity and Habitat require a finding that Horse Creek has "unavailable conditions" because these criteria are not affected by the allowed discharges in this case, namely Total Suspended Solids and pH. TDEC argues first that Biological Integrity and Habitat are not parameters within the meaning of the Antidegradation rule. In addition,

---

[10] The Board does state in its reply brief that the issues raised by the Appellees in this case

> fall squarely within the ambit of Tenn. Code Ann. § 69-3-105(i) insofar as it allows a permit appeal . . . . [I]t is clear that the Board is authorized to review the permit decision and 'reverse or modify the decision *upon finding that is does not comply with the provisions of this part*' Tenn. Code Ann. § 69-3-105(i) (emphasis supplied). It is axiomatic then that the Board is authorized under § 69-3-105(i) to determine the correct application of the rules, and the Antidegradation Statement in particular, in reviewing [Appellees'] permit appeal.

However, arguments raised for the first time in reply briefs are likewise considered waived by this Court. ***Regions Financial Corp. v. Marsh USA, Inc.***, 310 S.W.3d 382, (Tenn. Ct. App. 2009) (citing ***Gentry v. Gentry***, No. E2000-02714-COA-R3-CV, 2001 WL 839714, at *4 n.3 (Tenn. Ct. App. 2001) ("[I]t is not the office of a reply brief to raise issues on appeal.")).

TDEC argues that the Antidegradation rule, as well as federal law, allow a "parameter by parameter" approach to determining "unavailable conditions," in which the TDEC determines whether the waters are available or unavailable only for the specific pollutants proposed to be discharged. Because neither Biological Integrity nor Habitat would be affected by Total Suspended Solids or pH, TDEC argues that Horse Creek was properly classified as having "available conditions" for purposes of the proposed, and ultimately allowed, discharges. Finally, TDEC argues that, because the trial court disregarded TDEC's interpretation of the statute in favor of the Appellees' construction, the trial court failed to follow the summary judgment procedures requiring the court to give all reasonable inferences in favor of the non-moving party, in this case TDEC.

This issue involves statutory interpretation. Issues involving statutory interpretation are questions of law, which we review *de novo* with no presumption of correctness. Tenn. R. App. P. 13(d). Generally, questions of law are appropriate at the summary judgment stage. ***Metro. Dev. and Hous. Agency v. Trinity Marine***, 40 S.W.3d 73, 76 (Tenn. Ct. App. 2000). However, as this case involves the interpretation of a rule enforced by an administrative agency, courts are required to afford deference and controlling weight to an agency's interpretation of its own rules and regulations. ***Jones v. Bureau of TennCare***, 94 S.W.3d 495, 501 (Tenn. Ct. App. 2002) (citing ***Profill Dev., Inc. v.. Dills***, 960 S.W.2d 17, 27 (Tenn. Ct. App. 1997)). Indeed, in ***Profill Dev., Inc. v.. Dills***, 960 S.W.2d 17, 27 (Tenn. Ct. App. 1997), a similar declaratory judgment case involving land pollution, this Court held that:

> [TDEC] has the knowledge, expertise and experience and is charged with the administration of the technical details of the statute. Accordingly, [TDEC's] decisions concerning the applicability of technical terms of the statute are entitled to deference in the same manner as other technical decisions. ***Wayne County v. Solid Waste Disposal Control Board***, 756 S.W.2d 274, 279–280 (Tenn. Ct. App.1988).

*Id.* at 27. Thus, TDEC's interpretation of the regulations at issue are entitled to deference in this Court. There are, however, limits to this deferential standard. One such limitation is that the rule or regulation to be interpreted by the agency "must be ambiguous." ***Liberty Mut. Ins. Co. v. Tennessee Dept. of Labor and Workforce Development***, No. M2010-02082-COA-R3CV, 2012 WL 11739, at *7 (Tenn. Ct. App. Jan. 3, 2012) (citing ***Christensen v. Harris County***, 529 U.S. 576, 588 (2000)); *see also* ***Moore v. Hannon Food Service, Inc.***, 317 F.3d 489, 495 (5th Cir. 2003). Another limitation is that the agency's interpretation of its own rule or regulation shall not be "plainly erroneous or inconsistent with the regulation." ***Jones***, 94 S.W.3d at 501 (citing ***Jackson Express, Inc. v. Tennessee Public Service Comm.***, 679 S.W.2d 942, 945 (Tenn. 1984)).

We first consider TDEC's argument that the trial court erred in finding that both Biological Integrity and Habitat are parameters for purposes of the Antidegradation rule. We note, however, that this issue, while argued in TDEC's brief, was not designated as an issue on appeal. Generally, an issue argued in the body of the brief, but not designated as an issue will be considered waived. *See Forbess v. Forbess*, --- S.W.3d ----, 2011 WL 6153607, at *7 (Tenn. Ct. App. 2011) (citing *Childress v. Union Realty Co.*, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002). Regardless, even if we were to consider this issue as properly raised in this Court, it is without merit.

Tennessee Compiled Rule and Regulation 1200-04-03-.03 contains the "Criteria for Water Usage" for the various uses of water found in Tennessee. Horse Creek is classified under the "Fish and Aquatic Life" use of water. The listed criteria for evaluating the "Fish and Aquatic Life" use of water include not only Total Suspended Solids and pH, but also Biological Integrity and Habitat. *See* Tenn. Comp. R. & Reg. 1200-04-03-.03(3). TDEC does not dispute that Total Suspended Solids and pH are properly considered parameters. The Biological Integrity criterion states in pertinent part:

> The waters shall not be modified through the addition of pollutants or through physical alteration to the extent that the diversity and/or productivity of aquatic biota within the receiving waters are substantially decreased or adversely affected, except as allowed under 1200-04-03-.06 [the Antidegradation rule].

Tenn. Comp. R. & Reg. 1200-04-03-.03(3)(m). Therefore, based on the plain language of Rule and Regulation 1200-04-03-.03(3)(m), Biological Integrity is a parameter that must be considered when applying the Antidegradation rule. The Habitat criterion likewise states:

> The quality of stream habitat shall provide for the development of a diverse aquatic community that meets regionally-based biological integrity goals. Types of habitat loss include, but are not limited to: channel and substrate alterations, rock and gravel removal, stream flow changes, accumulation of silt, precipitation of metals, and removal of riparian vegetation. For wadeable streams, the instream habitat within each subecoregion shall be generally similar to that found at reference streams. However, streams shall not be assessed as impacted by habitat loss if it has been demonstrated that the biological integrity goal has been met.

-32-

Tenn. Comp. R. & Reg. 1200-04-03-.03(3)(n). Habitat is listed with Total Suspended Solids and pH, which are undisputedly parameters, as well as Biological Integrity, which is clearly a parameter by its plain language. In addition, the Antidegradation rule itself states, in the "unavailable conditions" provision, that "[w]here impairment by habitat alteration exists, additional significant loss of habitat within the same area of influence shall not be authorized unless avoidance, minimization, or in-system mitigation can render the impact de minimis." Tenn. Comp. R. & Reg. 1200-04-03-.06(2). Therefore we must conclude that the plain language of Tennessee Compiled Rules and Regulations 1200-04-03-.03(3) and (6) provide that Habitat is likewise a parameter that must be considered in applying the Antidegradation rule. As previously stated, when a statute is unambiguous, the Court may apply its plain meaning without regard for the agency's interpretation. *See Liberty Mut. Ins.*, 2012 WL 11739, at *7. Therefore, we conclude that both Biological Integrity and Habitat are parameters for purposes of the Antidegradation rule.

We next consider TDEC's argument that the trial court erred in concluding that a finding of impairment in one parameter requires a finding of "unavailable conditions" as to the entire body of water. Instead, TDEC argues that its policy of finding "unavailable conditions" only as to the types of pollutants proposed to be discharged is the appropriate method of applying the Antidegradation rule.

TDEC presented evidence in the trial court that it follows a "parameter by parameter" approach. According to the deposition of Mr. Denton, in considering a discharge permit, TDEC considers whether "available conditions" or "unavailable conditions" exist only with regard to the proposed discharges, in this case Total Suspended Solids and pH. If conditions are available for those discharges, the body of water is considered to have "available conditions" for purposes of the proposed permit. In his deposition, Mr. Denton explained TDEC's approach:

> A. So they say, what are they discharging. They look [at] that list.
> Q. Solids. In this case, suspended solids?
> A. Suspended solids.
> Q. Okay.
> A. So they look, and they say, is the stream available or unavailable for what they want to discharge. See, they look at it from that direction, not the other direction. They look at the list—the applicant has told them what they want permission to discharge.
> Q. Okay. If—if they make this determination that it's somehow available for sediment, is it irrelevant whether adding additional

solids into the stream is going to contribute to the impairment with respect to biological integrity?

A. If they make a determination that it's available conditions, then—paragraph Number 2 [regarding "unavailable conditions"] no longer applies. It's paragraph Number 3 that applies [regarding "available conditions"].

\* \* \*

A. I agree that the stream is unavailable. I disagree that it[] . . . logically follows, that it's unavailable for silt. That's a different determination.

\* \* \*

Q. So in a case like this, what has happened is the permit writer would have gotten . . . the assessment showing there were unavailable conditions . . . with respect to biological integrity and habitat alteration, correct?

A. Correct.

Q. And then, your view is that—the analysis is that the permit writer makes a determination of whether there are available conditions for the . . . substance that the applicant actually wants to discharge, correct?

A. Correct

In support of its construction of the Antidegradation rule, TDEC cites ***Kentucky Waterway Alliance v. Johnson***, 540 F.3d 466 (6th Cir. 2008), which states that, under federal law:

These "approaches for identifying high quality waters fall into two basic categories: (1) pollutant-by-pollutant approaches, and (2) water body-by-water body approaches." [40 C.F.R. § 131.12(a)(2)]. Under the pollutant-by-pollutant approach (which is the same as [TDEC's] parameter-by-parameter approach), "the State makes a classification for each pollutant in a given water body." ***Ohio Valley Environmental Coalition v. Horinko***, 279 F. Supp.2d 732, 747 (S.D. W. Va. 2003). The water body is then given Tier II protection [referred to as "available conditions" in Tennessee] against those pollutants for which "water quality is better than applicable criteria." *Water Quality*

-34-

> *Standards Regulation*, 63 Fed. Reg. at 36,782. "[A]vailable
> assimilative capacity for any given pollutant is always subject to
> [Tier II] [or "available conditions"] protection, regardless of
> whether the criteria for other pollutants are satisfied." *Id.* Thus,
> under this approach, the same water body could be classified as
> Tier II [or "available conditions"] for certain pollutants and Tier
> I [or "unavailable conditions"] for other pollutants. *See Ohio*
> *Valley*, 279 F. Supp.2d at 747.

*Id.* at 476. Thus, TDEC argues its interpretation of the Antidegradation rule is reasonable and that the trial court erred in disregarding its evidence and granting summary judgment to the Appellees.

In contrast, Appellees argue that summary judgment was appropriate because the language of the Antidegradation rule supports the interpretation that a finding of impairment of any one parameter requires a finding that the body of water as a whole is "unavailable," which would trigger greater protections from pollution. The language of the Antidegradation rule states:

> (1) It is the purpose of Tennessee's standards to fully protect
> existing uses of all surface waters as established under the Act.
> Existing uses are those actually attained in the waterbody on or
> after November 28, 1975. Additionally, the Tennessee Water
> Quality Standards shall not be construed as permitting the
> degradation (see definition) of high quality surface waters.
> Where the quality of Tennessee waters is better than the level
> necessary to support propagation of fish, shellfish, and wildlife,
> and recreation in and on the water, that quality will be
> maintained and protected unless the state finds, after
> intergovernmental coordination and public participation, that
> lowering water quality is necessary to accommodate important
> economic or social development in the area in which the waters
> are located. Sources exempted from permit requirements under
> the Water Quality Control Act should utilize all cost-effective
> and reasonable best management practices. . . .
>
>                               \*     \*     \*
>
> (2) Unavailable conditions exist where water quality is at, or
> fails to meet, the criterion for one or more parameters. In

unavailable conditions, new or increased discharges of a substance that would cause or contribute to a condition of impairment will not be allowed. Where impairment by habitat alteration exists, additional significant loss of habitat within the same area of influence shall not be authorized unless avoidance, minimization, or in-system mitigation can render the impact de minimis.

(3) Available conditions exist where water quality is better than the applicable criterion for a specific parameter. In available conditions, new or additional degradation for that parameter will only be allowed if the applicant has demonstrated to the department that reasonable alternatives to degradation are not feasible.

Tenn. Comp. R. & Reg. 1200-04-03-.06.

The trial court apparently credited the Appellees' interpretation, stating:

The rule's statement of what constitutes "unavailable conditions" is clear. Such conditions exist "where water quality is at, or fails to meet, the criterion for one or more parameters." Rule 1200-4-3-.06(2). The rule does not say "where water quality is at, or fails to meet, the criterion for the parameters of the substance to be discharged." Thus the scope of the rule is not whether "unavailable conditions" exist as to the substances to be discharged. The scope of the rule is broader. From the text of the rule, "unavailable conditions" exist where water quality fails to meet the criterion for "one or more parameters." Accordingly, it is the Court's conclusion that because in this case any one or more of the parameters listed under "Fish and Aquatic Life" are impaired in the waters in issue, even though those parameters are not the TSS or pH listed by the permit applicant for discharge, the "unavailable conditions" category applies.

One other piece of the analysis is whether a water could come under both the "unavailable conditions" category and the "available conditions" category depending on the substance being discharged. "No" is the court's conclusion.

* * *

The Court's construction is based upon two reasons. First, rule 1200-4-03-.02 requires the most stringent criteria be used. Secondly, TDEC has not provided the Court with an explanation nor has the Court been able to craft one that would demonstrate how a water fits within the "unavailable conditions" category could also be assessed based upon the "available conditions" category. A finding of "unavailable conditions" preempts application of the "available conditions" category.

Therefore based on the Court's construction of TDEC's rules and application of the undisputed facts, the Court concludes that TDEC was required to assess the permit application in issue under the "unavailable conditions" category of the Antidegradation Statement.

From our review of the transcript of the summary judgment hearing and the trial court's findings of fact and conclusions of law, however, we find no evidence that the trial court gave any deference to TDEC's interpretation of the Antidegradation rule. *See Profill*, 960 S.W.2d at 27. Instead, the trial court concluded that Appellees' approach was the correct interpretation of the Antidegradation rule given the purpose of the Water Quality Control Act to limit pollution and the plain language of the statute. As we perceive it, the trial court found the language of the Antidegradation statement to be unambiguous as it requires a finding of "unavailable conditions" when "one or more parameters" are impaired We respectfully disagree. While the above language suggests that a condition of impairment as to any one parameter requires a finding of "unavailable conditions," the rule goes on to state that "new or increased discharges of a substance that would cause or contribute to a condition of impairment will not be allowed." Thus, the rule contemplates that only those substances that affect "a condition of impairment" will be prohibited, which reading supports TDEC's parameter by parameter approach. Because of the conflicting language, we conclude that the Antidegradation rule is ambiguous. As previously discussed, when a rule is ambiguous, the agency's interpretation "is entitled to great weight." *Consumer Advocate Div. v. Greer*, 967 S.W.2d 759, 761 (Tenn. 1998). In addition, at the summary judgment stage, we review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003). We have previously held that:

Summary judgment "should not replace a trial when disputed factual issues exist, because *its purpose is not to weigh the evidence*, to resolve factual disputes, or to draw inferences from

the facts." ***Downs v. Bush***, 263 S.W.3d 812, 815 (Tenn. 2008) (emphasis added). Courts should grant summary judgment "only when both the facts and the conclusions to be drawn from the facts permit a reasonable person to reach only one conclusion." ***Carvell v. Bottoms***, 900 S.W.2d 23, 26 (Tenn. 1995).

***Brooks Cotton Co., Inc. v. Williams***, 77 UCC Rep. Serv.2d 493, 2012 WL 1392370, at *14 (Tenn. Ct. App. April 23, 2012). In this case, the conclusions to be drawn from the language of the Antidegradation rule and the evidence submitted in support of either party's interpretation permits a reasonable person to draw more than one conclusion. Because this issue requires the Court to consider the weight of the evidence submitted by both parties in support of their interpretations, we hold that summary judgment was inappropriate. Accordingly, summary judgment is reversed and this cause is remanded for further proceedings. Because the issue on remand is one of weight, the trial court should conduct a trial on the merits to determine the proper interpretation of the Antidegradation rule.

## VII. Conclusion

The judgment of the Chancery Court of Davidson County is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. Costs are taxed one-third to Appellant, the Tennessee Water Quality Control Board, one-third to Appellant the Tennessee Department of Environment and Conservation, and one-third to Appellees, Ron and Linda Pickard, as the Trustees of the Sharon Charitable Trust, and as individuals, for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE